GERMO MANUFACTURING COMPANY, Appellant, v. ROBERT C. COMBS, et al., Respondents.

In The Kansas City Court of Appeals, March 6, 1922.

1. TRADEMARKS AND TRADE-NAMES: Processes: Formulas: Unfair Competition: Sale of Poultry Food Prepared According to Same Formula, Having Different Name and Appearance does not Constitute Unfair Competition in Strict Sense. Where a poultry food or medicinal compound manufactured and sold by defendant, though prepared according to plaintiff's secret formula, is sold by defendant under a different name, to same trade sold by plaintiff, and to be used for same purpose, but which is mixed with buttermilk giving the same a different color so that neither in name nor appearance can it be palmed off on buyers as plaintiffs poultry compound, its sale is not unfair competition in the strict, usual and ordinary sense.

2. ———: ———: ———: ———: Adding Further Ingredients or Making Minor Changes in Secret Formula Thereby Improving Product Does not Affect Right to be Protected in Enjoyment Thereof. Where a company, the owner of secret formula in the process of time, and as a result of experience, adds further ingredients or makes minor changes to improve its product, it is entitled to be protected in the enjoyment thereof against any one manufacturing an article having the same essential ingredients.

3. ———: ———: ———: ———: Corporation and Subsequent Stock-Holders not Charged with Knowledge of Incorporators that Formula was not a Trade Secret. Where partners, the owners of a formula for the manufacture of a poultry compound, upon organizing a corporation to take over the business of the partnership put the formula into the corporation as a valuable trade secret for the greater part of its capital stock, treated it and guarded it as such, built up a business thereon and put the fact that it was a secret into the corporate records whereby they were enabled to dispose of their stock at a large price, the corporation and the subsequent stockholders were not charged with the duty or obligation of knowing that it was not a trade secret.

4. ———: ———: ———: ———: Former Owners of Formula Who Sold Same to Corporation as a Trade Secret, Held Estopped to Deny that the Same was a Secret and are not Entitled to be Protected from Interference. Where partners, the owners of a formula for a poultry remedy brought the same into a partnership as a secret and then sold it as such to a corporation organized by them, placing the fact that it was a secret upon its corporate records whereby succeeding stockholders could be induced to buy, and did buy stock, paying a great price therefor, such former owners of the formula and their associates using the same in competition with the corporation, were estopped to deny that it was a secret or entitled to be protected from any interference or competition on their part, the corporation being entitled to have said formula protected against encroachments by former owners and associates.

5. ———: ———: ———: ———: Owner of Secret Unpatented Process or Formula Entitled to Protection Against Those Using the Same Through Breach of Trust or Violated Confidence. One who has a secret process or formula, even though unpatented, has a property right therein, which, though subject to be lost should one honestly discover or rightfully come into the possession of a knowledge of the same, nevertheless, will be protected as against those who, through breach of trust or violated confidence, attempt to apply the secret to their own use or to impart it to others.

Germo Mfg. Co. v. Combs.

6. ———: ———: ———: ———: Placing Names of Constituent Elements of Secret Formula on Label Did not Deprive Plaintiff of Relief Against Those Attempting to Use Same Through Breach of Trust or Violated Confidence. Where plaintiff the owner of a secret formula in order to comply with the laws of a State placed the names of the constituent-elements thereof upon the label and while the publication of the elements composing it might endanger the disclosure of the formula to one who could rightfully discover and appropriate it, the same did not deprive plaintiff of relief against defendants using the formula through breach of trust or violated confidence since the label did not disclose in what proportions to mix the ingredients so as to produce a healthful remedy and appetizer instead of a dangerous poison.

7. ———: ———: ———: ———: Defense of Abandonment not Favored, Especially in Behalf of Wrongdoer. In an action by owner of secret formula to prevent its use by another, the charge that owner is not entitled to relief because it placed constituent-elements thereof upon a label, is a defense of abandonment, and such defense is not favored especially in behalf of a wrongdoer.

8. ———: ———: .———: ———: Boastful Claims in Puffing Advertisements as to Matter not Involved in Controversy Have no Bearing Thereon, and Cannot Defeat Plaintiff's Right to Relief on Ground That Advertisement Made Greater Claims Than Plaintiff was Entitled to. Boastful claims in a puffing advertisement as to a matter or right not involved in the controversy should have no bearing thereon, as in equity the maxim of "clean hands" refers only to the matter to be litigated.

9. ———: ———: ———: ———: Equity Will Grant Relief Against Rival Business Wrongfully Using Formula of Corporation, Purchased by it as Valuable Trade Secret. Where the evidence shows that a formula, for the maufacture of a poultry compound, was brought into a partnership as a private secret formula, owned and controlled by the partners, and it was sold as such by them to a corporation organized by them, and the fact that it was a secret stated in its corporate records, and afterwards emphasized by the manner in which its business was conducted, and its stock was subsequently sold at a large price, which could never have been obtained except upon the ground that the corporation owned and controlled a valuable trade secret, equity will grant the corporation relief against another competing partnership and rival business organized by defendant to manufacture and sell substantially the same compound under another name.

10. ———: ———: ———: ———: Estoppel: Pleading: Estoppel Should be Given Effect Although not Specifically Pleaded Until in the

**Reply.** Where the facts creating estoppel are fully pleaded in the petition, though the word itself is not used until in the reply and then it is stated not as an element of plaintiff's cause of action but as a shield against the defense raised that a formula was not secret, *held,* the plea of estoppel should be given effect although not specifically pleaded until in the reply.

Appeal from the Circuit Court of Jackson County.— *Hon. Willard P. Hall,* Judge.

REVERSED AND REMANDED.

*Henry Lamm, Bruce Barnett, G. W. Barnett* and *J. H. Rodes* for appellant.

*Guthrie, Conrad & Durham* for respondent.

TRIMBLE, P. J.—Plaintiff is a Missouri corporation organized in 1903 for the purpose of, among other things, owing and controlling formulas and more especially of manufacturing and distributing a compound known as "Cholorine," a preparation for poultry. And ever since that time, it has been engaged in the preparation and sale of said poultry remedy, and formula for which it claimed and now claims, to own and control.

Defendants are partners doing business under the name of the "Milkoline Manufacturing Company," which partnership was formed August 13, 1914; and ever since has been engaged in the manufacture and sale of a poultry compound called "Milkoline."

This suit was instituted by plaintiff in April, 1917, to enjoin defendants from making use of the alleged secret formula owned and used by plaintiff in compounding its remedy "Cholorine" and to restrain defendants from engaging in unfair competition with plaintiff whereby the latter is deprived of the full ownership of said formula and of the full benefit and results of its business.

The case was tried by the chancellor, and a decree was entered dismissing plaintiff's bill. Whereupon

plaintiff appealed to this court where the case was submitted at the March term, 1919. It was transferred to the Supreme Court in order to set at rest the question of whether or not jurisdiction was with us. We entertained the view that even if the petition did not pray for damages in excess of $7500, yet as the pleadings and evidence clearly showed that if plaintiff's claims were upheld and defendants were enjoined from the further prosecution of their business of selling "Milkoline," the *loss accuring to defendants would far exceed the limit of our jurisdiction,* therefore the right to adjudicate and pass upon the case was in the Supreme Court. The principal relief sought by the bill was to deprive the defendants of their right to manufacture and sell "Milkoline." The Supreme Court had held that if the monetary value of the "right *lost*" was within the jurisdiction of that court then jurisdiction was there. [State ex rel. v. Reynolds, 256 Mo. 710, 718.] And we accordingly order it transferred. We thought that the mere fact that plaintiff's petition contained a prayer for damages in an amount within our jurisdiction was not decisive of the matter, in a case where the monetary value of the *right sought to be taken from the defendant* was a sum vastly in excess of our jurisdiction. The Supreme Court evidently thought otherwise, however, for it ordered the case retransferred to us, although it did not expressly pass upon the particular feature of the question hereinabove mentioned. [See Germo Mfg. Co. v. Combs, 229 S. W. 1072.]

The petition charges that for many years plaintiff has been engaged in the manufacture and sale of a poultry remedy called "Cholorine" made according to a secret formula exclusively owned and controlled by it; that said remedy has been extensively advertised by it as a valuable remedy in the treatment of diseases of fowls and as a tonic for hogs, and an extensive and valuable business has been built up, in which more than $10,000 a year is expended in maintaining a force of

traveling salesmen in all parts of the country to sell the same to merchants, shippers, feeders and dealers in poultry; that it has strictly guarded and kept as an inviolate secret the names and quantities of the ingredients entering into "Cholorine" as well as the proportions and methods of compounding the same; that plaintiff's uniform policy has been to impose on all its officers and employees, in any way connected with the business, the duty to preserve said secret and not divulge the same, and it became their duty to do so after they ceased employment with said company; that the officers and employees well knew they had neither legal nor equitable right to themselves compound the same or a like preparation by the use of any one or all of the essential ingredients forming a necessary or essential part of said formula.

The petition further alleged that said secret formula for the manufacture of "Cholorine" and the exclusive right to use and compound the same by the use of any and all ingredients entering therein, were by said corporation purchased for a valuable consideration from the defendant Combs, who claimed to be the originator and exclusive owner thereof, and that thereafter all the interest of said Combs and the exclusive right to the use of said formula vested in the plaintiff corporation, and the same was and is a valuable asset and property right exclusively owned and controlled by plaintiff; that at the time plaintiff purchased said formula of the defendant Combs he, the said Combs, was a large stockholder in said company, one of the chief promoters and organizers thereof, and that thereafter defendant Combs retained his connection with said company and for a number of years acted as chief or associate manager and as president thereof; that while connected with said company Combs at all times jealously guarded said formula as a strict company secret and valuable corporate asset as it was his duty and legal obligation to do; that by reason of Combs' confidential relations with said company, and

by reason of his having sold and conveyed said formula
to said plaintiff company, while claiming to be the origi-
nal compounder, discoverer and exclusive owner thereof,
"said Combs was doubtly bound, not only not to use
and employ said formula himself, in order to engage
and to enter into competition with the plaintiff company
by compounding the same, or like preparation to be used
for like or similar purposes as that for which 'Cholorine'
was manufactured and sold, but it, moreover, became
his highest legal and moral obligation and duty to the
plaintiff company to use his utmost endeavor to pre-
serve inviolate the name of any and all ingredients,
agents and compounds used in said formula, and to pro-
tect and preserve to said plaintiff company its property
rights in the exclusive ownership thereof, so as to guard
and protect it from any competition arising from any
other person, firm or corporation who sought to gain a
knowledge of the secret ingredients entering into the
same."

The petition further alleged that among other means
recommended and prescribed by it for administering
"Cholorine" to poultry as a preventive of disease and
health-preserving remedy, and as a body-builder, egg-
producer and curative agency, one was "to mix it in
connection with water with dry food stuff, to be fed
to said fowls, but the same was particularly recom-
mended by plaintiff to be used by all poultrymen by
introducing it into buttermilk, and other liquid food, in
addition to administering it to poultry in drinking
water."

The petition further alleged that said preparation
when so administered in buttermilk and other liquid.
foods, according to directions, constituted a very valu-
able preventive, remedial and useful agent for all pur-
poses for which it was advertised, and is and has been
extensively used throughout the country by admininster-
ing it in prescribed quantities in buttermilk and other
liquid foods, but preferable by introducing it into butter-

209 M. A.—42

milk and administering it to fowls, all of which was well-known to said Combs by reason of his connection with the plaintiff and his former ownership of said formula; that the mode of administering the same to fowls, and the quantities in which the same were administered, and especially by introducing it into buttermilk, were very largely worked out and employed by said Combs in the interest of said company, as was his duty, during the time he was owner of said stock and in the management of the corporation's business.

The petition further alleged that after said Combs had been connected with the plaintiff company as an owner of stock therein and as president thereof and its chief managing director in the promotion of the company's business and the creation of a large demand for "Cholorine," he sold and disposed of his stock for a valuable consideration; that after the sale of his interest in the company, he was employed as a traveling salesman of the plaintiff and in said capacity, defendant Combs visited many large poultry associations and assemblies of poultrymen, feeders and raisers in many parts of the United States as chief sales agent in the sale and distribution of "Cholorine;" that he acquired a large and valuable acquaintanceship among the large poultry raisers, feeders and shippers, and in the capacity of plaintiff's chief sales agent he attended public meetings of said raisers, dealers and feeders, working in the interest of the plaintiff company and the patronage which he and other agents thus built up for the company is a very valuable asset, one acquired at a large expense of time, money and extensive advertisement.

The petition then alleged that "after selling and disposing of his stock, as aforesaid, and serving his connection with the said plaintiff company, said Combs wrongfully and fraudulently conceived the idea of entering into unjust, unlawful and unfair competition with the plaintiff company, and did enter into wrongful and

fraudulent competition with plaintiff, by manufacturing and compounding the said preventive and remedial agent, by use of all the essential ingredients entering into and used in compounding of said 'cholorine,' by placing said ingredients in their proper portions in buttermilk and in condensed milk, instead of water, and marketing it to said customers, and prospective customers, of the plaintiff company, including feeders, shippers, dealers and raisers of poultry and others engaged in the poultry industry, all of whom are, and were, patrons, or prospective patrons, and customers of the plaintiff in the purchase of said preparation known as 'cholorine,' as aforesaid;'' that ''defendant, Combs, for the purpose of more effectually concealing the fact that he and his co-defendants were, and are, wrongfully engaged in competition with the plaintiff in using its formula, named and designed his product, so wrongfully manufactured and compounded by him, as 'milkoline,' which he, in connection with his co-defendants, as hereinafter averred, advertise and sell as a 'Medical liquor food for fowls.' ''

The petition further charged that while Combs and his co-defendants ''have adopted a different name from 'cholorine,' namely, that 'Milkoline,' it is substantially the same preparation and contains all the essential ingredients of 'cholorine,' the only difference being that said essential ingredients are introduced in so-called milk, instead of water; and that said 'milkoline' is manufactured under the same formula by use of all the essential ingredients used in the manufacture of 'cholorine,' and that in the manner, and by the means employed and adopted as aforesaid, he, the said Combs, and his co-defendants, named herein, are engaged in unlawful, unjust and unfair competition with the plaintiff;'' that ''the only remedial agents used in compounding the said product known and compounded as 'milkoline,' are the same remedial and medical agents and ingredients that have been, and now are, exclusively used in compounding

plaintiff's said preparation and remedy known as 'chol-
orine;' " that "defendants, by the manner and means
aforesaid, have entered into, and are now engaged, under
the name of The Milkoline Manufacturing Company,
in unfair, unjust and unlawful competition with plaintiff
by depriving the plaintiff of the full ownership of said
formula, and the full results of its said business, by
selling large quantities of said 'milkoline' to plaintiff's
former patrons, purchasers and customers, and to pros-
pective patrons and customers herein;" that "for the
purpose of more effectually concealing this wrongful
competition and transacting said business upon a large
scale, the defendant, Combs, has entered into and formed
a co-partnership with James E. Chandler and Carl W.
Kent, of Kansas City, Missouri (who are named as co-
defendants herein), and that with the connivance, co-
operation, aid and assistance of said co-defendants, and in
joint collaboration therewith, is manufacturing said prep-
aration known and designated as 'milkoline,' and is
selling the same in large quantities in unfair, unjust
and unlawful competition with the plaintiff, and are con-
ducting their said business as a co-partnership under
the name of The Milkoline Manufacturing Company, at
Kansas City, Missouri;" that "The Milkoline Manufac-
turing Company is a partnership named, employed and
adopted by these defendants for the wrongful and unlaw-
ful purpose of employing and using the secret informa-
tion that defendant, Combs, possessed and had full knowl-
edge of as aforesaid, while in the employ of plaintiff com-
pany, and in violation of his contract of sale to the plain-
tiff, and for the purpose of more effectually entering into
unlawful, unjust and unfair competition with the plain-
tiff; that plaintiff does not know the exact partnership
interest the defendants, Chandler and Kent, have in said
The Milkoline Manufacturing Company, but it alleges
the fact to be that the defendants have associated them-
selves with said Combs for the purpose of carrying out
and affecting the unlawful purpose and design to use
said formula of plaintiff, so wrongfully appropriated by

said Combs, and to wrongfully appropriate to their own use and profit, the patrons, and prospective patrons, and customers, many of whom the said Combs, himself secured as customers of plaintiff while he was connected with plaintiff as its confidential representative and sales agent, as aforesaid; the said Combs is, and at all times has been, the business manager of the said The Milkoline Manufacturing Company, and that he is the principal owner, organizer and promoter thereof, and owns a very large interest in said partnership business, equal to, or greater than, a half interest thereof; that the defendants have wrongfully taken from the plaintiff, and appropriated to their own use, many customers and prospective customers of plaintiff, and the profit on a large business that it has built up, and has materially damaged the plaintiff in a sum in excess of $10,000; that defendants are now engaged in said unlawful competition, and purpose to continue the same to the further great loss and damage to this plaintiff; that on account of the continuing nature of defendants' wrongful acts, and the inability of the plaintiff to determine fully the amount or extent of its damages, and the fact that it is a constantly continuing and recurring injury, which renders it impossible to definitely estimate the extent and nature of plaintiff's injury and damage, and because plaintiff has no adequate remedy at law, it appeals to the equitable interposition of this court for injunctive relief. That if defendants are not restrained and enjoined from their unlawful competition, plaintiff will continue to suffer and sustain great and irreparable loss and injury from which no adequate remedy is given at law.

The petition closed with the prayer that "the defendants, and each and all of them, singly and collectively and as co-partners, be enjoined from using plaintiff's secret formula, or any of the essential ingredients thereof, and from compounding any preparation, under any name whatsoever, by the use of any of the essential in-

gredients entering into plaintiff's secret formula, and restrained and enjoined from selling, or attempting to sell, upon the market, any preparation so compounded and mixed, as aforesaid; and that they be enjoined and restrained from continuing the aforesaid unfair, unjust and unlawful competition with plaintiff; and restrained and enjoined from communicating to any other person, firm or corporation, any knowledge which would lead to a disclosure of plaintiff's secret formula, or any of the ingredients therein, and for all other and further relief to which, in equity and good conscience, the plaintiff may be entitled; and that the court, upon restraining and enjoining defendants, may take an account as to the extent of plaintiff's damages and award the plaintiff such damages that it has sustained, by reason of such unfair competition, in the sum of seven thousand five hundred dollars ($7,500); and that the plaintiff may have and recover from the defendants the costs in its behalf laid out and expended.''

The answer admitted the incorporation of plaintiff and the partnership of defendants; that plaintiff was in the business of compounding and selling a preparation called ''Cholorine,'' and that defendants were in the business of compounding and selling a preparation called ''Milkoline.''

The answer also contained a general denial and then particularly denied that the preparation known as ''Cholorine'' was a secert formula, or that it was the practice of plaintiff to keep it secret. The answer then stated that defendants ''deny that the defendant, Robert C. Combs, ever claimed to be the originator of the formula for making 'cholorine,' or the exclusive owner thereof; deny that said defendant Combs, wrongfully, unlawfully and fraudulently, or in any other way, conceived the idea of entering into unjust, unlawful or unfair competition with the plaintiff company, or that he did enter into wrongful, or unlawful, or fraudulent competition with plaintiff, either by the use of all of the essential

ingredients entering into and used in the compounding of 'cholorine' or in any other manner; deny that said preparation known as 'milkoline' is substantially the same preparation or that it contains all of the essential ingredients of 'cholorine;' deny that the only difference between the two preparations is that in the preparation known as 'milkoline' the ingredients are introduced into milk instead of water, and deny that said 'milkoline' is manufactured under the same formula or by the use of all of the essential ingredients used in the manufacture of 'cholorine,' and in this connection these defendants say that only one of the four or more ingredients entering into the preparation of 'cholorine' is used by these defendants in the preparation of the remedy known as 'milkoline' and that this ingredient is used in entirely different quantities and proportions in 'milkoline' from the proportions and quantities in which it is used in the preparation known as 'cholorine' and that the ingredient referred to is a well-known ingredient among the feeders and raisers of poultry and has been for many years and that it enters into various preparations under divers and sundry names, which are used by those engaged in the handling and raising of poultry, and that its merits and value in that respect are and for many years have been a matter of common knowledge. These defendants in this connection further say, that the preparation of 'cholorine' is more especially a medicine or perhaps a tonic for poultry and that it has no food value whatsoever, while on the other hand said preparation known as 'milkoline' is primarily and chiefly a food for poultry, and that any effect it may have as a medicine or a tonic is incidental merely.''

By way of affirmative defense, the answer then alleged—

''(a)  That the formula for making the preparation known as 'cholorine' is not now and has not been at any of the times mentioned in plaintiff's petition a secret formula, but is and for many years has been

known to divers and sundry firms persons and individuals who did not get their knowledge of it directly or indirectly from these defendants or any or either of them; and these defendants say that the plaintiff has itself published and made known the contents of said preparation.

"(b)    That this plaintiff advertises and represents to the public that said 'cholorine' is a 'product of the chemists' laboratory;' that 'Pasteur himself never did anything more notable than the achievement of our (referring to plaintiff) master chemists who discovered and perfected 'cholorine;' that 'the first problem was to locate and classify the germs of poultry diseases;' that 'this was done after years of patient experiment and research.'

"That the truth is, 'cholorine' is not the product of a chemists' laboratory, but it is a preparation which has been in common use for many years, under various names; that plaintiff has never located or classified the germs of poultry diseases, either after years of patient experiment and research or otherwise; nor has the plaintiff as it advertises and represents to the public, compounded elements that would instantly kill germs located or classified by plaintiff, nor taken years of time nor made thousands of experiments to do so. That such advertising and misrepresentation are intended to and do deceive and mislead the public, and that by reason thereof this plaintiff is not entitled to any relief from a court of equity to protect it in the manufacture and sale of said preparation.

(c)    These defendants further say, that this suit was not instituted by the plaintiff and is not being prosecuted by it in good faith, for the purpose of protecting the formula known as 'cholorine,' for the improper and unlawful purpose of ascertaining how to manufacture the preparation known as 'milkoline;' and that this plaintiff instituted and now prosecutes this suit for the purpose of oppressing the defendant Combs and through

the medium of the untruthful allegations of said petition to bring him into disrepute with his co-partners, Chandler and Kent, with the unlawful purpose on plaintiff's part of inducing his said co-partners to dissol:e their partnership with the said defendant Combs, to the end that they might thereupon enter into a contract or arrangement with the plaintiff whereby the plaintiff and the defendant Chandler and Kent, or one or the other of them, might jointly manufacture and sell said preparation known as 'milkoline,' to the exclusion of the said defendant Combs.''

To this answer plaintiff filed a reply denying that only one of the ingredients entering into and used in Milkoline enters into or is used in the preparation of Cholorine and asserting that each and every ingredient having any medical effect or any effect whatever is contained in and enters into Milkoline and that each and every such ingredient in Milkoline is contained in Cholorine.

The reply then went on to say ''that said preparation called Milkoline is not a food of poultry, either primarily or incidentally and does not have any value as a food in the slightest degree or precentage whatsoever; that said preparation called Milkoline has the same qualities, serves the same purposes and has the same effect as said preparation called Cholorine and none other, and the representations and advertisements which have been and are made by defendants that said preparation called Milkoline is a food are false, and the same and the use of buttermilk as the base into which are introduced the only ingredients having any effect upon any poultry or other animals to which said preparation called Milkoline could be administered, are a fraudulent means to which defendants have resorted for the purpose of deceiving plaintiffs and the public and concealing the fact that said preparation called Milkoline is the same as that called Cholorine.''

The reply further denied that plaintiff ''has ever made known the formula or contents for said prepara-

tion called Cholorine or that the same is known other than to plaintiffs and defendants and their confidential agents and servants and that the defendants Chandler and Kent derived their knowledge thereof from defendant Combs and not otherwise, and further plaintiff says that defendants are estopped to deny that said formula is a secret by reason of the fact that defendant Combs sold, transferred and delivered unto plaintiff said formula as being secret and as such defendant Combs received from plaintiff a large and valuable consideration therefor.''

The reply then denied that ''it has ever made to the public or to any person whomsoever any representation or representations by advertisement or otherwise which was not true or which was or were intended to or did deceive or mislead the public or any person or persons whomsoever; and that the expression 'our master chemists' as employed in the advertisements referred to in defendants' answer was intended to and does relate solely to master chemists generally who first compounded the remedy while being possessed of full knowledge of the location and classification of the germs of poultry diseases, and said term 'our master chemists' was not intended to and does not refer to chemists in plaintiff's employ; and plaintiff says that said preparation called Cholorine is a product of the chemists' laboratories and that it is a notable and valuable discovery as shown by its long and successful use in the treatment of diseases of poultry; and further plaintiff says that even if the representations and advertisements made by plaintiff as referred to in defendants' answer were not true in fact, the same would not constitute any defense whatsoever to any of the matters or facts alleged in plaintiff's petition.'' The reply also specifically denied that the suit was instituted in bad faith or for the purpose of ascertaining how to manufacture Milkoline.

The facts gleaned by a careful study of the record are as follows:

Sometime in 1902 defendant Robert C. Combs approached Mr. Joseph D. Donohue in Sedalia asking him

if he wanted to get rich and saying that he had a formula for the preparation of a poultry remedy which he had long wanted to put on the market. He told Donohue that it was "a wonderful remedy;" that he knew about it and its virtue for a good while; that his father had been selling it as Comb's Chicken Cholera Cure. Donohue says he doesn't know whether Combs told him where his father lived or not, he, Donohue, knew very little about his business, he knew, however, that the father had lived in Scotland county, near Memphis, Mo. Defendant Combs told Donohue that the formula was the same as Comb's Chicken Cholera Cure. Donohue says Combs "brought that formula to the partnership." Combs himself says that he originally told Donohue he would take $500 for a half-interest in it, but that Donohue only paid $100 although he agreed to pay $500. At any rate the partnership was formed and all that Combs put into it was the formula for making Cholorine. He put no money into the enterprise, nor anything into the business of the partnership except the formula.

Between November, 1902, and April, 1903, the partnership had accumulated assets to the amount of $1100; and on April 7, 1903, the two and Donohue's wife incorporated the Germo Manufacturing Company, the plaintiff, with a capital stock of $10,000, Combs taking one-half, or fifty shares, of the stock and Donohue and his wife taking the other half. The purposes for which the corporation was organized, as stated by the articles of incorporation, were "to conduct a general and wholesale manufacturing business, that is, to prepare and compound chemicals, . . . to own and control formulas, patent rights, agency rights, and more especially to manufacture and distribute a compound known as 'Cholorine,' which is the name and registered trade-mark of a preparation for poultry."

The assets of the corporation at the time of its creation were the assets of the partnership which were conveyed to the corporation so as to constitute its fully paid

capital stock of $10,000, and the same consisted of $500 merchandise on hand, a fixture account of $75, one or two other items, and the formulas which went in at a valuation of $8,897.76. While the documents and records speak of "formulas" there was in reality only one formula, that for Cholorine, the "Germo Insecticide" formula not being satisfactorily worked out for over a year after the incorporation. Combs never put a penny into either the partnership or the corporation, and the larger portion of the capital stock of the corporation consisted of the formula for making Cholorine. The transfer from the partnership to the corporation, as shown by the records of the latter, was a transfer for a consideration of $10,000, of "all of the *formulas,* receipts, rights, accounts, stock, stationery, fixtures, trade-marks, etc., in short, all property, *business, benefits* and accumulations arising from the partnership heretofore existing between the above named parties, composing the Germo Company, including cash, accounts due, etc., and to pay therefor the sum of ten thousand dollars ($10,000); said business items, etc., to be turned over to the Germo Manufacturing Company by bill of sale from above named parties, each conveying his whole interest in said Germo Company, its rights and privileges; said *formulas to be written out* in full, *sealed in an envelope* and placed in the custody of the secretary and president."

The business of the corporation prospered, defendant Combs finally became possessed of the larger portion, if not all, of the stock of the corporation and later sold his stock therein and the present owners of the Company acquired the same at an expense of something like $24,500.

After selling his stock, defendant Combs was in the employ of the plaintiff as its traveling salesman in the sale and distribution of Cholorine and in this capacity he further extended his already wide acquaintance with poultry-men and others interested as patrons in the purchase of said remedy, and continued in such employ up

to August 1, 1914, on which date his connection with the plaintiff ceased. Fourteen days later he organized the partnership with his co-defendants and began selling the product called Milkoline. If, as he claims, Milkoline is essentially different from Cholorine and was conceived and worked out by him, it must have been done while he was in the employ of the plaintiff as its traveling salesman, for there was no sufficient interval of time between the termination of his employment and the organization of the defendant partnership to sell Milkoline in which to work out the formula thereof. He says he first made up fifty gallons of it and sent out samples giving it away to poultry dealers to use as a test. He says he can't remember the first order he ever took for Milkoline. "There might have been some taken before the 13th of August, when I first commenced to figure on going into it. There had been none taken before the first of August that I know of; none that I remember of. That is a matter I would likely forget." He got orders the first month to the extent of from $400 to $600. Many of these orders were from people he had sold Cholorine to and who were plaintiff's patrons.

There is no question but that in one of the letters he wrote extolling the qualities of Milkoline he said, "Will say that the writer is the originator of cholorine," and then went on to say that while he took pains to tell everybody cholorine was the best "poultry *medicine*" ever on the market, yet is was "not anything like milkoline" for the simple reason that the former contained a certain chemical while in milkoline only a little of it was used as a preservative; but that the main point to milkoline is "that you not only get the *medicinal* qualities, but it has a *food value* that is greatly sought for by the large feeders of poultry." Defendant Combs, while admitting that he wrote this letter, says that he meant thereby that he originated merely the *name* "Cholorine" and not the mixture or the compound itself; and yet in still another letter he said, speaking of Cholorine, "I am the man

that *first put this formula together,* and the first cholorine that was ever put on the market was in the fall of 1901 by myself.''

The record discloses that Milkoline is being advertised largely, and widely sold to the same patrons that use or would use Cholorine; that large dividends are being declared and that it is encroaching upon plaintiff's business which is decreasing.

Are Milkoline and Cholorine the same, or essentially the same compound, sold to the same trade and used for the same purpose? There is no question that it is to sold to the same trade, and the evidence clearly shows that it is to be used for the same purpose. True, Milkoline is mixed with buttermilk while Cholorine is mixed in water, and Cholorine is red while Milkoline is white. So that neither in name nor appearance is Milkoline such a compound as can be palmed off on buyers as Cholorine, and therefore the matters complained of against defendants do not constitute unfair competition in the strict, usual and ordinary sense. [26 R. C. L. 876, sec. 53.] But if Milkoline and Cholorine are essentially or substantially the same, used for the same purpose and sold to the same trade, the only difference being that one is mixed in buttermilk and the other diluted in water, the ability of the former to encroach upon and supplant the trade of the latter is just as great and as dangerous as if they were the same in name and appearance. And indeed it is much more so, if the public is told that the same man who originated Cholorine perfected Milkoline, and that the latter, in addition to doing what cholorine does, is also a *food* as well as a *medicine.* In fact, the method of combining it with buttermilk a recognized food which gives it a different color from cholorine, and naming it something else, is much safer than putting it up in a form similar in appearance and name to cholorine, since thereby the appearance of unfair competition is avoided.

Consequently the important questions are: First, Are the two compounds substantially the same? Second.

Is the combination of the essential ingredients of each, and the purpose to which it is applied, a trade secret such as that plaintiff is entitled to the exclusive use thereof as against these defendants? Third. If it is not a trade secret in the sense of its being a discovery unknown to science before, but is merely the combination and adaptation of old principles applied to new purposes, and in a way to successfully accomplish those purposes, with which the general public is not acquainted, can it be the subject of protection by a court of equity in favor of one who has come into and preserved a knowledge of it, or who, like plaintiff, has purchased it of the one who has done so? Fourth. Even if, in fact, it is not a strict trade secret in the sense that no one ever knew it before, but it nevertheless is of the character set forth in question three, are defendants estopped to deny that it is a trade secret, because of the fact that defendant Combs *sold it to plaintiff as such,* and therefore is plaintiff entitled to relief as against these defendants, even though it would not be entitled to any relief as against anyone else who honestly, and without violating any equities or confidences, came into the knowledge of how to make and apply the compound?

As to the first question, whether the two compounds are the same.

The chancellor filed a written opinion in which he found that they are both compound in accordance with the same formula, and we agree with that finding. Defendants seem to controvert the fact that the chancellor so found, but we think that clearly the finding is as we have stated. For instance, the chancellor says that Combs, after selling his stock, became a traveling salesman and sold plaintiff's preparation on the road, and that "while thus engaged he conceived the idea of making milkoline, *using the old formula . . . except substituting buttermilk for water,* and the new name milkoline, instead of the former names" and that "although originally cholorine and milkoline were both compound-

ed in accordance with the old formula . . . except, as hereinbefore stated, that in milkoline buttermilk was used instead of water, in course of time changes were made in compound both colorine and milkoline. *The essential ingredients, however, were the same."* The fact that minor changes were made in each is immaterial, and the chancellor states he attaches no importance to that fact. If in the process of time and as a result of ex-perience, further ingredients were aided or minor changes made to improve the product, the company rightfully engaged in the business had a right to do so, and was entitled to the enjoyment thereof. [Eastman Co. v. Reichenbach, 20 N. Y. Supp. 110, 112.] That the essen-tial ingredients of the two are the same was shown by the chemists who testified, and there is no evidence to the contrary.

The second question is as to whether the combination was, in point of real fact, a strict trade secret? It was not in the sense that the formula by which cholorine was compounded had never been used before. Many years before, in Scotland county, Comb's father, the "Chicken King" of that part of the country, had used it in making a preparation which he called, or which was called, Combs Chicken Cholera Cure. The evidence does not otherwise disclose who originated it. Druggists mixed it them-selves and sold it as Combs Chicken Cholera Cure when it was called for. The evidence does not disclose that anyone outside of the county knew how to make it, and the druggists who testified that they used to make it ad-mitted that they did not know how to make it now. And there is no evidence that anyone outside of plaintiff and defendants know how it is made. We do not how-ever state these as fundamental facts upon which this decree is based but merely set them out as showing what the record discloses. The formula by which it was then made not a secret and was not them claimed to be owned by anyone as a secret, and it was not in reality a strict trade secret. But at the time defendant Combs went into

partnership with Donohue and later formed the plaintiff corporation, it was not generally known to the public, and neither Donohue nor the corporation had any reason or grounds for not thinking it a secret, and the evidence is unquestioned that both Combs and Donohue *thought it was a secret.*

There is no evidence that Combs told Donohue the formula was known to the druggists or the public in Scotland county. He simply told Donohue it was a formula his father had used under the name of Combs Chicken Cholera Cure. As he was proposing to sell the formula for a consideration and to put it into the partnership as his contribution to the partnership assets, necessarily the inference would be that it was a secret and not one belonging to the world, and one that defendant Combs had gotten from his father. Combs says when they first started "we thought we had a secret" but that they soon got over it. There is nothing shown in the evidence, however, to cause them to get over that thought. There is no question but that they both treated it as such. Donohue says they first mixed cholorine themselves, and then they hired a man to do that, cautioning him not to give it out; that they had signs up for people to keep out; that they never mixed it in the presence of other people; that they used code numbers for the different ingredients. These were 1, 2, 3 and 4. No. 4 was called "Sol" and another "Nellie;" that he and Combs "both adopted that method and used it. Our purpose was to keep it a secret." Combs testified that he did not then (at the trial) know what was in Cholorine but "I knew it *when I owned the formula."* Donohue was Combs' partner in the business when it first started and one of the chief incorporators afterwards, but he is now a disinterested witness having sold his stock, and for a long time has not been connected with the business in any way. So far as the present owners of the stock in the plaintiff corporation are concerned, they never knew that the formula for Cholorine was ever used before.

209 M. A.—43

Combs' contention, according to his testimony, is that "anyone who knew the formula" could go ahead and make cholorine if they didn't use the *name* Cholorine, and admitted that he had used in the preparation of Milkoline an ingredient in Cholorine "but wholly in a different way" so that they didn't constitute an infringement on Cholorine in any manner, shape or form. He also said he could make Milkoline in several different ways without using any ingredients in Cholorine, and the only reason for not doing so was that they cost more. He refused to disclose what was in Milkoline, and refused to say what difference there was between Milkoline and Cholorine, saying that the reason plaintiff sued him was to find out how he made it. According to the chemist that analyzed Milkoline, the only ingredients not in Cholorine were those ingredients which constitute ordinary buttermilk. And it is conceded Combs got a one-half interest in the defendant partnership for bringing to it a *secret* known only to him. His contention now is, however, that such secret is merely a method of keeping buttermilk from spoiling and that Milkoline is a *food* rather than a *medicine*. But the record discloses that Milkoline is advertised and sold for the same purpose and to the same class of trade and as a *remedy* for the same diseases as cholorine. The advertisements for cholorine were that "it is an appetizer" for poultry, "makes fowls eat and digest their food," "prevents 'cropbound,' Roup, Limber-neck and Cholera," "puts red in the comb, makes sick fowls well— its object is to stop shrinkage and loss from disease." "It prevents shrinkage, it is a liquid poultry appetizer." "A poultry tonic, builder, combined in one." "It is for cholera, Roup, Limber-neck and other germ diseases." The advertisements of Milkoline say that "Milkoline is made from pure buttermilk-method of fattening poultry." "Pure buttermilk is its basis, but buttermilk so changed and medicated that its value as a poultry appetizer and fattener is increased many fold." "Milkoline, while a substitute for buttermilk is really better than the

real article, because of its *medicinal* qualities with *germ killing ingredients added* which are positively harmless to poultry, but *certain death to certain disease germs, which cause loss from Roup, Diarrhoea and Cholera, etc."* "Milkoline is a food *tonic, appetizer and medicine* all in one. It is more than just buttermilk, it is *medicated* buttermilk. Remember when you are using the Milkoline method you are using *medicated* buttermilk. So do not *make the mistake of adding any patent medicine to it."* "Give 2 oz. of Milkoline to a gallon of water—this will clean out the fowls and put birds in perfect condition. Milkoline will drive out all disease germs."

The directions were to put one gallon of milkoline in fifty gallons of milk or water, and that one gallon of milkoline in fifty gallons of water is a substitute for buttermilk. The chemists, however, say that in such a mixture there is *no food value* whatever; that the ingredient numbered 4 in the fromula for Cholorine is the thing which acts as a preservative of the buttermilk and that said ingredient No. 4 is the chief medical ingredient in both Cholorine and Milkoline and is the disease destroying agent in both preparations. There is also another ingredient common to both, which is a very pungent penetrating substance which defendants claim in their compound acts by getting on the chicken's bill and being communicated to the feathers by the chicken in its preening, drives away the insects that would injure it. Whatever effect it may have, it is manifest that it will operate in the same way whether introduced in water or in buttermilk. And if the preparations are substantially the same and operate in the same way, the only effect of mixing it in buttermilk instead of water is to *lend color* to the idea that milkoline is also a food as well as a medicine. There is really little other difference, since buttermilk is itself eighty to eighty-five per cent water. The chemists say that the only things not found in cholorine which are found in milkoline are the things found in buttermilk. In other words Milkoline is Cholorine

mixed in buttermilk as a solvent and liquifier instead of water.

The evidence further discloses that the preservative of the plaintiff corporation wrote the advertising literature for it and that he also wrote the advertising literature for the defendant partnership.

The evidence further discloses that the preservative effect on buttermilk which Combs claims is the great secret he brought to the defendant partnership, is merely an effect which any of several acids have on it and that the preservative effect of this ingredient has long been well-known to the world; and it furthermore appears that although defendants have taken out of Milkoline ingredient No. 3 in the formula for cholorine, yet they advertised that they could furnish this ingredient separately and then the patron could add it to the milkoline as used, the ingredient being taken out in order to get a different rating on the freight.

Now, the chancellor's finding is not contrary to the above and foregoing facts. Indeed, as we have heretofore shown, his finding is that the two compounds are essentially the same. But he further found that the formula for cholorine was not, *in fact,* a secret formula because of its use by Combs' father and the sale of the compound in Scotland county many years ago as Combs Chicken Cholera Cure. The Chancellor's decree is based upon the theory that the plaintiff corporation did not acquire it as a secret formula. That theory is that since Combs and Donohue both knew Combs' father had used the formula and since it was not then *in fact* a secret formula, the knowledge of these two men became the knowledge of the corporation, and hence plaintiff cannot claim that it was a secret formula or that Combs and his co-defendants are estopped to deny that it is a secret formula. We have seen, however, that certainly Donohue did not know it was a public formula and that both Combs and he *thought* it was a secret; that Combs put it into the partnership and later into the corporation,

constituting the greater part of its capital stock, as a *valuable secret;* that they always treated and guarded it as such, built up a business thereon, put the fact that it was a secret into the corporate records where succeeding purchasers of stock could see that it was such and be induced thereby to take the stock; and that thereafter Combs, having secured all the stock, was enabled to dispose thereof at a large price on the theory that it was a valuable trade secret owned and controlled by the plaintiff corporation. Under these circumstances does the second question have to be clearly and explicitly answered in the affirmative before plaintiff is entitled to any relief? In other words, must the formula be shown to be in truth and in fact a trade secret in the strict sense of that term, before any relief can be granted? We think not, for even if the formula is not a strict trade secret in the sense of being a new discovery no one had ever used before, still it was not generally known to and used by the world, and hence neither Donohue nor the plaintiff corporation, nor the present stockholders thereof, can be charged with the duty or obligation of knowing that it was not a trade secret. The knowledge Combs had, or even the knowledge that both he and Donohue had, cannot be imputed to the plaintiff corporation. They sold the formula as a trade secret to the corporation, receiving in exchange therefor practically the entire capital stock of the corporation. They were acting for themselves in a matter wherein their personal interests were conflicting with its interests. Hence whatever knowledge they or either of them may have had as to the formula being a public and not a private one, was not and did not become the knowledge of the corporation. [Johnston v. Shortridge, 93 Mo. 227, 232; 10 Cyc. 1063; Martin v. South Salem Land Co., 94 Va. 28, 58; Burnes v. Trenton Gas Light Co., 27 N. J. Eq. 33; Brookhouse v. Union Pub. Co., 73 N. H. 369.] See, also, cases cited in note to same case in 6 Ann. Cases 679 and Mechem on Agency, secs. 721-23. Consequently,

even if the formula in question be not a strict trade secret, but is merely the combination and adaptation of old principles applied to new purposes and in a way to successfully accomplish them, with which the public is not generally acquainted, nevertheless plaintiff is not to be denied all equitable relief under the circumstances of this case. And here comes in question No. 4, for since Combs brought the formula to the partnership as a secret and the partners then sold it as such to the corporation, placing that fact upon its corporate records whereby succeeding stockolders could be induced to buy stock and did buy stock, paying a great price therefor, as the present owners of said corporation did, then whether the formula is or is not a strict trade secret, Combs and his co-defendants are estopped to deny that it is a secret or not entitled to be protected from any interference or competition *on their part*. [Stone v. Grasselli Chemical Co., 65 N. J. Eq. 756; Stuckes v. National Candy Co., 158 Mo. App. 342, 354; Hall Safe and Lock Co. v. Herring, etc., Safe Co., 143 Fed. 237; Paxon v. Brown, 61 Fed. 874, 881.] Consequently, the case must be disposed of on the theory, as against these defendants, that the formula is a secret which plaintiff is entitled to have protected against the encroachments which defendants are making.

It is well settled that one who has a secret process or formula, even though unpatented, has a property right therein, which, though subject to be lost should one honestly discover or rightfully come into the possession of a knowledge of the same, nevertheless will be protected as against those who, through breach of trust or violated confidence, attempt to apply the secret to their own use or to impart it to others. [22 Cyc. 842; Thum Co. v. Tloczynski, 72 N. W. 140; Hartman v. John D. Park & Sons, 145 Fed. 358; Eastman Co. v. Reichenbach, 20 N. Y. Supp. 110, 116; Hopkins on Unfair Trade, 153 et seq.; American Stay Co. v. Delaney, 97 N. E. 911; Simmons Med. Co. v. Simmons, 81 Fed. 163; Salomon

v. Hartz, 40 N. J. Eq. 400; Little v. Gallus, 38 N. Y. Supp. 487.] ''Upon the sale of a secret process, a covenant express or implied, that the seller will not use the process himself, or communicate it to any other person is lawful, because the process must be kept secret in order to be of any value, and the public has no interest in the question by whom it is used.'' [Hartman v. Park & Sons, supra, l. c. 378.]

In Luckett v. Orange Julep Co., 271 Mo. 289, 299, Johnstone never claimed to be the originator of the formula for Howells Orange Julep, but the defendants did seek to obtain the trade of those who bought the other company's syrup on the ground that he was the originator of the formula (p. 300) and the latter company got some of the former's trade. Injunction was granted. In the case at bar Combs did all of this and more. And his co-defendants cannot avoid the consequences of his acts, for his wrong is for the benefit of the firm. [Priddy v. McKenzie, 205 Mo. 181, 194-5.]

It is urged that Cholorine is merely the use of a single well-known chemical the effects of which are also known and that there cannot be any exclusive right to use such. But the defendants' evidence shows that No. 3, another ingredient, is useful in a certain way and performs its function, and, as we have shown, if it acts that way in Milkoline it would have a similar effect in Cholorine. Besides the formula was sold to the plaintiff corporation as a secret formula capable of exclusive ownership, and at the time Combs placed it in the partnership as his part of the enterprise, Donohue did not know its ingredients, nor did the corporation, when the formula was exchanged for the greater part of its capital stock, know of its constituents. It would seem that the same principle of estoppel would apply here as in the other features of the case. The formulas of the two compounds are the same except that Milkoline, when fed to the fowl, has a trace of buttermilk in it, and yet defendants are strenuously insisting that Milkoline is a

secret formula which they are not required to divulge, but that Cholorine is merely a single chemical which is not entitled to any protection as a secret. The evidence is amply sufficient to show and unquestionably does show that the situation is at least as set forth in the above questions 3 and 4 and that under the circumstances of this case plaintiff is entitled to relief.

It is contended that plaintiff has lost its rights since, in order to comply with the Kansas law, it placed the names of its constituent elements upon the label. But the evidence of the chemists is that even with the names of the elements no one who was not a chemist and able to analyze the compound could tell in what proportions to mix the ingredients so as to produce a healthful remedy and appetizer instead of a dangerous poison it is capable of being. The publication of the elements composing it might endanger the disclosure of the formula to one who could rightfully discover and appropriate it. But this does not deprive plaintiff of relief against defendants in the circumstances of this case. [22 Cyc. 843.] In addition to this, the defense here considered is a charge of abandonment, and such defense is not favored, especially in behalf of a wrongdoer. [Hopkins on Unfair Trade, 126.]

It is urged that plaintiff is not entitled to any relief whatever because certain of its advertisements make greater claims than plaintiff is entitled to. But the cases cited are where the plaintiff is attempting to preserve a trade name which in itself is a falsehood, and hence are not applicable. Making boastful claims in a puffing advertisement as to a matter or right not involved in the controversy should have no bearing thereon. [Mossler v. Jacobs, 66 Ill. App. 571. See, also, Edison Electric Light Co. v. Sawyer-Man Electric Light Co., 53 Fed. 592; Coer D'Alene, etc., Mining Co. v. Miner's Union of Wardner, 51 Fed. 260.] In equity, the maxim of "clean hands" refers only to the matter to be litigated. [Coons v. Coons, 236 S. W. 358.]

It is further contended that Milkoline can be made by ingredients that will have the same effect as the ingredients that Cholorine have. If so, well and good, provided the ingredients, methods and processes learned in plaintiff's business are not used and no further claims are put forth that the man who concocted it is the originator of Cholorine thus artfully implying that the former is therefore better than the latter since the same genius who conceived it has improved upon the other so that Milkoline is not only a food but is also a medicine therefore the buyer need not purchase the other remedy. But under the evidence the fact remains that they are now composed of the same essential ingredients. Equity looks at the heart and substance of things, disregarding outer trappings. Whatever may arise to divert attention, it cannot blink its eyes to, nor get away from, the fact that the formula for Cholorine was brought to the partnership as a private secret formula owned and controlled by the partners; that it was sold as such by them to the plaintiff corporation and that fact embalmed in its corporate records and afterwards emphasized by the manner in which its business was conducted, and then subsequently its stock was sold at a large price to its present owners, which could never have been obtained except upon the ground that the corporation owned and controlled a valuable trade secret; and then after accomplishing all this, the secret is brought to another partnership and a rival business started upon the same foundation and with the prestige and acquaintance gained while in charge of the former, all of which are used with telling effect. Such a course is not right, by whatever name it may be called, or however it may be camouflaged, and equity will grant relief in such circumstances.

It seems to be somewhat contended that no reliance can be had upon estoppel herein because estoppel is not mentioned until in the reply. The facts creating estoppel are fully pleaded in the petition, though the word itself is not used until in the reply and then it is stated

not as an element of plaintiff's cause of action but as a shield against the defense raised that the formula was not secret. There are many cases in which estoppel is given effect although not specifically pleaded until in the reply.

For the foregoing reasons we entertain the view that the decree of the chancellor herein should be reversed and the cause remanded for a new trial establishing plaintiff's equities within the limits and in accordance with this opinion and affording plaintiff an opportunity for such an accounting of profits as it may be properly entitled to.

Judgment reversed and cause remanded. All concur.