## WIRE WHEEL CORPORATION OF AMERICA v. C. T. SILVER, Inc.

(District Court, S. D. New York. May 13, 1919.)

1. Patents ⬤�篇328—1,047,702, for spoke lacing, void for lack of invention.
   The Pugh patent, No. 1,047,702, for spoke lacing, *held* void for lack of invention, in view of the prior art.

2. Patents ⬤�篇36—Commercial success as evidence of invention.
   Commercial success is a most hazardous test of invention; its main value being in cases where the existing means have for some time been unsatisfactory and where the new step has at once answered the need and displaced what went before; and where to this is added the fact that others have earlier tried to reach the same result such proof has added weight.

In Equity. Suit by the Wire Wheel Corporation of America against C. T. Silver, Incorporated. Decree for defendant.

Decree affirmed (C. C. A.) 266 Fed. 229.

Figures 1, 2, 3, 6, and 7 of the Pugh patent, and Figures 1, 2, and 5 of the Hammon patent, referred to in the opinion, are as follows:

PUGH PATENT.

Fig. 2.          Fig. 3.

Fig.6

Fig.7

HAMMON PATENT.

Fig. 1.

Fig. 2.

*Fig. 5.*

Charles Neave, of New York City, Frank Parker Davis, of Chicago, Ill., and Clarence S. Walker, of Buffalo, N. Y., for plaintiff.

Melville Church, of Washington, D. C., and Oscar W. Jeffery and Harry G. Kimball, both of New York City (George M. Finckel, of Columbus, Ohio, of counsel), for defendant.

LEARNED HAND, District Judge. [1] As the issue of validity must in my judgment necessarily go against the patent, I shall confine myself to a discussion of that alone. The tension wheel was concededly old; indeed, the world owes it to the imagination of that varied and amazing genius, Leonardo da Vinci. It depended upon the fact that the hub of a wheel might be made to hang from its upper spokes as well as rest on its lower. However, it was at once obvious that the spokes themselves, having no inherent rigidity, but only tensile strength, could not suffer the torsional strains involved in a traction torque at the hub, if they ran radially from hub to felloe. The line of strain, being tangential to the hub, cuts directly across a radial spoke. Hence it became known long before Pugh's time that, to be effective, traction wheels should have the spokes set tangentially to the hub, from which it also followed that the tangents must run in both directions, else the hub would tend to twist under its own load. I may therefore assume the knowledge of the art of a tension wheel with spokes set tangentially.

Pugh had before him two requirements; i. e., to brace such a wheel against shock coming from without for the most part, and to accommodate his wire tension wheel to the conventional established gauge of

266 F.—15

the motor car. The shocks he provided against, where the wheel remained symmetrical, by running spokes from the ends of the hub to the opposite side of the felloe. This is shown in Figures 1, 2, and 3 of his patent. This was all that was necessary in cases where he need not concern himself with the gauge of the vehicle. However, it so chances that this much of his patent had been exactly disclosed in every detail, so far as I can see, by Hammon, 574,538, over 20 years before, in 1897. Hammon's Figure 2 shows a tension wheel of which the spokes are both tangential and radial, and laced precisely as Figure 1 of Pugh and substantially as shown in his Figure 2, though the cross-lacing does not run to the extreme rim of the felloe. Figure 5 of Hammon shows a tension wheel all of whose spokes are tangential, but laced slightly differently from the Pugh patent (Figures 1 and 2). The lacing of Figure 5 of Hammon differed from that of Figure 1 for no essential reason that I can perceive. It is clear at a glance that at pleasure either the spokes, 4, of Figure 1 might be tangential or that the spokes, 7, of Figure 5 might be laced as shown in Figure 2.

Again, in Sharp's British patent of 1908, 2,618, exactly similar lacing is shown of a wheel all of whose spokes are tangential. Grauert and Humphris show the same lacing in wheels with radial spokes. This art taken as a whole anticipates Pugh, so far as Figures 1, 2, and 3 go, and must have made well known the system of cross-lacing which the defendant has adopted.

It is quite true, however, that Figures 1, 2, and 3 of the patent in suit do not show the central plane of the wheel offset from the center of the hub, and it is upon this element alone that the patent may rely. Pugh's earlier British patent (sub nom. Rudge-Whitworth, 1905, 14,-892) shows an offset or "dished" wheel for a motor car, made up of two sets of tangentially disposed tension spokes or wires, each set running from one side of the hub to the nearer side of the felloe. That wheel is precisely the same as Figures 6 and 7 of the patent in suit, except for the fact that, instead of running all the spokes from the inner side of the hub to the inner side of the felloe, half are run to the inner side and half are crossed to the outer side. In short, Figures 6 and 7 show no greater bracing power from outside shocks than the earlier patent, but they do show a bracing against shocks from within.

The sole question upon which validity depends is therefore this: In view of Hammon, Sharp, and the other patents noted, was it invention to change Pugh's first patent by running half the spokes from one side of the hub alternately to opposite sides of the felloe? The defendant has copied Hammon's and Sharp's spoke arrangement exactly; all he has done is to make it into a "dished" wheel, a thing disclosed, not only in Pugh's earlier patent, but in Eisenhuth and Harrington as well. In considering the invention involved in this change it must be remembered that it added nothing of value to the wheel taken alone, but only made the cross-lacing available for a standard motor car. The necessities of a "dished" wheel were forced upon Pugh only by the conventional tracking gauge or tread already established for motor cars. No one has suggested that wheels made like Hammon's or Sharp's

would not have answered quite as well as Pugh's, except that they would not have been put upon standard motor cars without increasing their tread, or changing the width of the chassis.

I cannot bring myself to see that, having once solved the "problem," assuming it was any problem at all, of "dishing" the ordinary wire wheel, it took any inventive power to make Hammon's and Sharp's wheel into a "dished" wheel, precisely as the defendant has done. Once the conditions of the industry presented that necessity, all the means were at hand to meet it. Doubtless it is always a difficult question to say, when any step is taken in art, what degree of imagination it required. Possibly judges are not well qualified to restate to themselves the stage in the technique of the art reached when the step was taken, or try to put themselves in the position of those who took it, yet the settled law requires them to do so, and, if not, novelty and invention would be synonymous.

I know of no objective test which will serve to answer that question, which arises in nearly every case; it must be solved by an attempt to reconstruct the scope and limits of imagination of the ordinary skilled man. Had such a one, having seen Pugh's first wheel, wished to use Hammon's or Sharp's lacing upon wheels that must not increase their tread, the solution would, I think, have come automatically. He would have only to shorten the spokes on one side and lengthen them on the other. Had he needed help for that, Pugh's patent was at hand. Perhaps there is nothing more to be said on the matter; I own I cannot think of any process of reasoning by which it can be further elucidated. The required standard·of conduct in such cases, as in some other branches of the law, e. g., negligence, notice, and the like, is not susceptible of deductive application; it must be constructed in each case for that case.

[2] As in all successful patents, the patentee, properly enough, relies upon the supposed proof of invention arising from commercial exploitation. It is a most hazardous test. Commercial success, as the courts have repeatedly observed, may arise from many other reasons than a new inventive idea. Without trying to lay down any exhaustive definition of the conditions where it may be helpful, I can very generally say that its main value is in cases where the existing means have for some time been unsatisfactory, and where the new step has at once answered the need and displaced what went before. When to this is added the fact that others have earlier tried to reach the same result, the proof becomes telling, and we hesitate to substitute our own judgment for the objective evidence that the new thing was not so easy to make as it looked.

The commercial conditions in Britain, where the patent arose, are nearly absent from this record. It appears that the wooden wheel, which has had a large vogue in the United States since 1905 and in France, never became popular in Britain, owing to the scarcity of wood. Pugh designed his offset wheel for motor cars in 1905, while the industry was in its earlier development, and so far as appears this was a satisfactory wheel. Perhaps the most that should be said is that the "Budd" wheel in the United States, which is also a "two-

spoke," has had a substantial test, and has not showed any dangerous weakness. Sharp designed his cross-lacing in 1908, only three years later, and prima facie, as I believe, the whole patent in suit was at hand. In April, 1909, one year later, Pugh combined the two, not as a separate invention, but as a new form, really unchanged, of Sharp, of whom he was probably not aware. Indeed, more properly it may be said to have been an adaptation of Sharp to heavy trucks. I see no reason to suppose that it was through any lack of inventive thought that the art was obliged to wait for a year to disclose the combination of Sharp and Pugh. Certainly there are many other possible explanations which one can conjecture, and which the proof does not exclude. So much, then, for the British commercial development of the wheel; at best it throws no light upon the question of invention.

Coming next to the United States, the evidence is much completer, but it does not show that the combination was desired before it appeared, or that it concluded successfully a series of unsuccessful experiments. The industry did not try to use the "dished" wheel, or the cross-lacing, and find them ineffectual for lack of combination. There is not the slightest evidence that the appearance of wire wheels waited upon Pugh. Fashion appears largely to have controlled the kind of wheels which the industry should adopt. When the motor car was originally manufactured commercially in the United States, it was fitted with wire wheels, generally with radial spokes, which continued until about 1905. The tread had not been so definitely established as at present, and in any event no "dishing" was required to accommodate a new form to old standards. Such wheels as were made were "symmetrical," and Hammon or Sharp would have answered all cross-lacing needs, if such there were.

In 1905, almost "overnight," the fashion changed to the wooden "artillery" wheels adopted from the French, who dominated taste in such matters because of their earlier development of the art and their finer workmanship. This type of wheel quite displaced the original "symmetrical" wire wheel, and fixed, as it were, a standard or "normal" tread. It controlled the market till 1911 or 1912. Then partly because of the introduction of English cars of the highest quality, of which the best known is the Rolls-Royce, but probably chiefly because of the energy, successful advertising, and other kinds of commercial suggestion of one Houk, the fashion began in part to turn back towards wire wheels. The result, however, was by no means to exclude the "artillery" wheel, which has more than held its place till the present time. But in 1909 Pugh had already invented the wheel of the patent in suit, and the solution was at hand as soon as the demand for it began to arise under Houk's commercial manipulation.

Nothing could therefore be more erroneous than to suppose that the American market had waited for the combination represented by Pugh's wheel, knowing the "dished" wheel and the cross-lacing, but failing to understand that their combination would bring the solution which they wished. On the contrary, it was either from the exceptional capacities of Houk, who knew how to make people buy what he, and not they, wanted them to buy, and from the introduction of

the higher grades of English cars. To accept commercial success as a test of invention under such circumstances is therefore to subject the art to a monopoly upon faulty analysis. No doubt the wire wheel, as such, always had its advantages and its apostles, as it has to-day; but its adoption did not depend upon some key to unsolved difficulties of structure.

Finally, it appears fairly clear that Pugh originally thought his invention to lie substantially in the cross-lacing. He asserts that the invention especially relates to heavy-wheeled vehicles like motor omnibuses, with heavy broad tires. "The invention consists in a wire-spoked wheel, in which the rim is carried by two sets of spokes, and two or more sets of additional spokes are provided; said spokes being disposed at considerable inclination to the central plane of the wheel, so as to give lateral strength and rigidity to the wheel." This was "the invention" whose "further object" was subsequently asserted to be in allowing a lateral displacement of the plane of the wheel. I infer that Pugh thought the "dished" wheel an illustration, an example, an embodiment of his invention of cross-lacing, in which he apparently thought himself the pioneer. The patent does not suggest, in spite of the "dishing" claims, that he supposed it would be invention to apply the cross-lacing, if old, to the "dished" wheel of his earlier patent. Yet those claims, as it now transpires, have only that on which to stand. It can hardly serve him that he later tried to limit his British patent to its "dished" wheel application, possibly through his discovery of Sharp. His original intent is disclosed by his original specification.

I conclude that the claim in suit is void for noninvention, and the bill will be dismissed.