## WIRE WHEEL CORPORATION OF AMERICA v. MADISON MOTOR CAR CO.

(District Court, W. D. Wisconsin.   September 23, 1920.)

No. 88–E.

1. Patents ⬤⟿32—Presumption of validity from foreign patent strengthened by decisions upholding those patents.

The presumption of validity of a patent from the successive issuance of similar patents in various foreign countries is strengthened by decrees of the courts of foreign countries sustaining the patents in those countries.

2. Patents ⬤⟿32—Presumption from foreign decree sustaining is rebutted by decree holding void.

The presumption of validity of a patent arising from the issuance of foreign patents and from decrees sustaining those patents is rebutted by a decree of the United States court of another circuit holding the patent void, which was sustained by the Circuit Court of Appeals.

3. Patents ⬤⟿328—1,047,702, claim 9, for automobile wire wheels, held valid and infringed.

The Pugh patent, No. 1,047,702, claim 9, for automobile wire wheels, in which the spokes from the inner side of the hub were attached to the opposite side of the rim, *held* to disclose invention and to be infringed.

In Equity.   Suit for infringement of patent by the Wire Wheel Corporation of America against the Madison Motor Car Company.   Decree directed for complainant.

F. P. Davis, of Chicago, Ill., and Clarence S. Walker, of Buffalo, N. Y., for plaintiff.

Oscar W. Jeffery, of New York City, for defendant.

EVANS, Circuit Judge.   [1] Patent in suit, No. 1,047,702, was issued to J. V. Pugh December 17, 1912, after a similar grant on the same wire wheel had been made by Great Britain on January 6, 1910. Pugh also sought and obtained a patent on the same wheel from the French government, and also from the German government.   The presumption of validity arising by virtue of these successful grants is strengthened by the judicial pronouncement of the German and French courts in favor of the validity of the respective patents granted by those governments; and while the state of the record is such that no intelligent conclusions may be drawn from the English litigation, it is nevertheless apparent that the Pugh wire wheel was and is freely recognized in England as the patented product of this inventor.

[2] This presumption, at best rebuttable, is overcome by the decision of Judge Hand holding the patent invalid.   The suit which resulted in this decree was well contested, and the decision was affirmed by the Court of Appeals without opinion.   266 Fed. 229.   The opinion rendered by Judge Hand in Wire Wheel Corporation of America v. C. T. Silver has been published in 266 Fed. 221.

[3] The difficulties that a court meets in determining the issue of fact upon which the validity of a patent depends is well stated by Judge Hand:

"Doubtless it is always a difficult question to say, when any new step is taken in an art, what degree of imagination it required.   Possibly judges are

not well qualified to restate to themselves the stage in the technique of the art reached when the step was taken, or try to put themselves in the position of those who took it, yet the settled law requires them to do so, and, if not, novelty and invention would be synonymous. I know of no objective tests which will serve to answer that question, which arises in nearly every case; it must be solved by an attempt to reconstruct the scope and limits of imagination of the ordinary skilled man."

In the last analysis, my decision, or any court's decision, must turn upon the test applied to Pugh's contribution to the automobile wheel art. That he made a contribution no one will deny. Whether that contribution evidences mere mechanical skill, was a solution of an engineering problem, or constituted invention, is the sole question for determination.

While wire wheels were old in 1909, and had been used on light automobiles, Pugh constructed a wheel that was usable on the stock automobile, then rapidly growing in favor. The court is not called upon to decide whether wire wheels are, or were in 1910, better than "artillery wheels," the wheels with wooden spokes. Neither is it to determine whether wire wheels with two sets of wire spokes may not be constructed as strong and as practicable as the wire wheel which Pugh built. Invention may appear in Pugh's wheel, notwithstanding wire wheels with two sets of spokes have been manufactured that resist strain and quite generally give satisfaction.

That there is some demand for, and some value to be found in, the wire wheel, cannot be denied. Whether that merit pertains to the ease with which the wheel may be removed, whether it consists in increased attractiveness in appearance, or in reduction of weight of the automobile below the springs, or in greater adaptability in other respects, is quite immaterial. Any one of them would be sufficient to justify the issuance of the patent, if invention otherwise appeared. What, then, was the problem? What, the solution?

Pugh's problem was not merely to construct a wheel with wire spokes, nor to construct a dished wire wheel. It was to construct a wire wheel that would stand the usage to which an automobile wheel would necessarily be put, and it was to be placed upon the axle of an automobile, the general construction of which had been fixed and determined by long usage. For example, the tread was established; the relative location of the wheel and the steering knuckle and the brake appliances was fixed. The automobile in common use at the time was heavy, and growing heavier. It was used for rapid transportation. Sudden and unexpected jars were so great that the wheels must of necessity be so strong as to carry the load and stand the bumps, and also to withstand the strains and shocks that come from the sides. *Likewise the wheels must be interchangeable with the "artillery wheels."*

That the two wire spoke wheels answered the requirement so far as load was concerned may be readily conceded. That the ordinary bycycle wheel did not meet the strains and shocks from the sides is also apparent, without demonstration. To widen the hub from which the spokes radiated would unquestionably help; but it created a new prob-

lem. Such a hub resulted in a widened tread. This was an insurmountable objection. Pugh therefore had to construct a wheel of the necessary strength in all respects, one that did not widen the tread, one that made possible the close relative position of the wheel and the steering knuckle and the brake, and that took proper care of the strain on the rims, and yet retained the lightness and other desired advantages of a wire wheel.

His problem was not merely to increase the number of spokes and vary the position, as experiment might require. He was not following, but reversing, mechanical and engineering practices and teachings, when he transposed the base and the apex of the "two sets of tension spokes connecting said inner end of the hub with the opposite sides of the rim." Relocation of spokes, or a mere increase in the number of spokes, may not in itself have constituted invention. But to transpose the base of the angle to the rim and the apex to the hub, in such a manner that the "two sets of tension spokes connected the inner end of the hub with the opposite side of the rim," was a new step, and the basis for the next step, which two steps resulted in a dished wheel, that was interchangeable with an artillery wheel, and it seems to me called for inventive ability, rather than mechanical skill.

The transposition of the base and the apex of these tension spokes, and the connection of the rim and hub in the manner described, was not all of Pugh's contribution. This alone would not have secured the desired results. But by extending the hub and connecting its outer end with the rim by a third set of tension spokes, as called for in the third element of the claim, Pugh met the problem of side strain and at the same time increased the efficiency of the tension spokes.

It is true he had before him his own invention of 1905, as well as Hammon's and Harrington's, and Frenier's, and Sharp's, and others; and he knew how the manufacturer had successfully made bicycle wheels. But his problem was a vastly different one. If it were merely a matter of getting sufficient strength to carry a heavy automobile load and resisting side strains and shocks, the Patent Office might well have said that his solution varied from other wheels merely in location and selection of spokes; but, as heretofore pointed out, Pugh was constructing a wire wheel that had to be placed upon an automobile in such a manner as not to interfere with the established tread, or with the effective use of the steering and brake appliances.

It is not difficult, after a problem has been solved, to take patent after patent, pick one feature from one patent, and another from the next, and then say the completed product is so near the patented product that the final step constituted but the work of a mechanic. But invention cannot be so determined. Rather must the mark of distinction fall on him who, appreciating both the means and desired ends, conceives of a relation of elements, old or new, in whole or in part, that will produce the desired results. It is quite immaterial if, after the conception is announced, the skilled mechanic readily understands it, or with slight or no difficulty builds the new device by practices or means well known to his trade.

Pugh's wire wheel, with "a wheel rim so disposed that its center plane is nearest the inner end of the hub, with two sets of tension spokes connecting the inner end of the hub with the opposite side of the rim, and a third set of tension spokes connecting the outer end of said hub with said rim," was absolutely new.  It was not at all the development of the bicycle wheel, or of any symmetrical wheel.  The changed position of the base and the apex of the tension spokes, whereby the inner end of the hub was connected with the outer sides of the rim on such a wheel, was new.  The stay spokes "connecting the outer end of the hub with said rim" may have been old, and its use alone and by itself would be a natural or obvious way of strengthening the wheel against side strains, yet it must be viewed here as an element in a new combination and its function not limited to resisting side strains.

That this conception of Pugh was not the solution of a mere engineering problem, or within the grasp of a skilled mechanic, who attempts to solve a problem as soon as the problem is presented, is, I think, demonstrated by Pugh's own experience.  He was an engineer, unusually well acquainted with the wheel-building industry, the originator of numerous inventions, and the owner of many patents.  He combined technical training with practical experience, and the rich reward which success entailed furnished him with an urgent inducement that few could appreciate better than he.  He sought a practical wire wheel for automobile use.

In 1905 he patented his two-spoke wire wheel.  In 1909 he made application for his wire wheel for heavy automobiles.  During that period (1905–1909) he met with rebuff after rebuff, and witnessed the too evident failure of his 1905 invention as the wheel for cars in general use.  Even when his first application was filed in 1909, the final solution was beyond his conception or his imagination.  Then, three months later, he filed his new specifications, disclosing the wheel here under consideration.  If the solution of the problem was so difficult for this man, who thus combined experience, patent knowledge, familiarity with the art, engineering knowledge, and familiarity with the demands of the trade, can the court say that his contribution evidenced merely mechanical skill?

It is hardly necessary to refer to the decisions.  Inasmuch, however, as my attention has been called to opinions written by myself in Walker Manufacturing Co. v. Illinois Brass Manufacturing Co. (C. C. A.) 265 Fed. 279, and Bone v. Marion County, 251 U. S. 134, 40 Sup. Ct. 96, 64 L. Ed. ——, 249 Fed. 211, 161 C. C. A. 247, the decisions in Deister Concentrator Co. v. Deister Machine Co. (C. C. A.) 263 Fed. 706, and Superior Machine Tool Co. v. Cincinnati Lathe & Tool Co., 259 Fed. 273, 170 C. C. A. 341, might well be added.

These cases are cited, not as precedents (for there can be no precedents where the facts are dissimilar), but to illustrate how far the courts have gone to uphold patents where the asserted inventive novelty consists of new arrangements of elements that are old.  In passing it might be said that the court did not hold the patent in the Bone Case invalid.  In the Deister Concentrating Co. Case a patent was upheld

where the contribution to the art consisted largely in new locations or positions of elements (riffles and planes in a concentrating table) that were old. In McCord v. Woods, 249 Fed. 203, 161 C. C. A. 239, the patent was upheld where the contribution consisted of a selected location of corrugations on a journal box, placed there for strengthening purposes. Reliance was there placed upon the decision of the Court of Appeals for the Second Circuit in Stilwell v. McPherson, 218 Fed. 839, 134 C. C. A. 611, where a patent on culverts was upheld that involved strengthening by corrugations.

True, in all of these cases the state of the art at the time of the issuance of the patent was an important and material factor in the determination; but in none of them was such inventive genius displayed as is here shown by Pugh. Entertaining these views, I cannot escape a conclusion that is opposed to the one reached by Judge Hand. Claim No. 9 is valid.

*Infringement.* Upon the question of infringement there is little to be said. Claim No. 9 reads upon the defendant's wheel. I find nothing that would justify me in narrowing the claim or the construction to be placed upon it so as to defeat infringement.

The decree must therefore be for the plaintiff. Counsel for the plaintiff will draw the proposed decree, submitting it to opposing counsel before submitting it to the court. Provision should therein be inserted that application for a reference may be made at any time after 60 days from the date of the decree.