**E. L. BRUCE CO. v. BRADLEY LUMBER CO. OF ARKANSAS.**

Civil Action No. 447.

District Court, W. D. Arkansas,
El Dorado Division.

Aug. 11, 1948.

H. M. Armistead, Sr., H. M. Armistead, Jr., and Armistead, Rector & Armistead, all of Little Rock, Ark., John W. Maher and John Boyle, both of Washington, D. C., for plaintiff.

Lamar Williamson, and Williamson & Williamson, all of Monticello, Ark., Clarence B. Des Jardins and William E. Schuyler, Jr., both of Cincinnati, Ohio, for defendant.

JOHN E. MILLER, District Judge.

On September 26, 1947, the plaintiff commenced this suit by filing a complaint charging the defendant, Bradley Lumber Company of Arkansas, with infringement of United States Letters Patent No. 2,341,161 issued February 8, 1944, for wood finishing, and owned by the plaintiff. The defendant answered alleging the following defenses:

(1) That the patent in suit is invalid and void as to both of the present claims thereof, because the subject matter defined by such claims did not involve invention in view of the state of the art, and was within the expected skill of the worker in the art.

(2) That the patent is invalid as a whole because of the final adjudication of invalidity of certain claims in the case of White v. E. L. Bruce Company, D. C., 66 F.Supp.

652, which held Claims 3 and 4 of Patent 2,276,253 and Claims 1, 2 and 5 of Patent 2,288,585 and Claims 1, 2, 5, 6 and 7 of the patent herein involved invalid because lacking invention over the prior art, which decision upon appeal to the Court of Appeals for the 3rd Circuit was affirmed, 162 F.2d 304, and the failure to bring another suit on such claims bars, plaintiff from maintaining this suit since the claims retained are not definitely distinct from the claims disclaimed, and Revised Statutes, § 4922, 35 U.S. C.A. § 71, does not apply.

(3) That the claims of the patent in suit are invalid because defining, as a method or process, nothing more than the mere functioning of the apparatus disclosed and claimed in the invalid apparatus Patent No. 2,288,585 issued to the plaintiff on the joint application of Partee and Gray.

(4) That there has been no infringement of the patent in suit by the defendant by reason of its operation since the cancellation of the license agreement on November 18, 1946, because the defendant has not used, during that period, what is defined by the claims of the patent.

On March 18, 1948, plaintiff amended its original complaint by adding thereto a "Second Cause of Action", charging that since the effective date of the cancellation, November 18, 1946, of a certain license agreement theretofore in force between the parties, defendant had continued to use certain "trade secrets" of plaintiff without payment of any royalty or other benefit to it.

In due time the defendant filed answer to the "Second Cause of Action" setting up its defenses as follows:

(1) That the court does not have jurisdiction of the "Second Cause of Action" since its jurisdiction depends upon diversity of citizenship and the presence of the jurisdictional amount, and that the jurisdictional amount is not present.

(2) That the amended complaint fails to state a cause of action against the defendant.

(3) Denies that it knew or was advised that any developments resulting from research, experimentation and development by plaintiff were released by the plaintiff only to licensees paying royalty under the patents covered by the license agreement.

Upon the issues joined by the pleadings the cause proceeded to trial to the court on May 3, to May 11, 1948, both inclusive, and learned counsel for the parties have filed exhaustive and able briefs and arguments in support of their respective contentions.

In cases such as is now before the court the facts are necessarily extensive and complex and should be found by the court in detail. This has been done and formal findings of fact in detail and conclusions of law, separately stated, have been made and filed herein. It is not necessary nor practical to repeat all of the facts as found by the court, and only such pertinent facts as are necessary to a clear understanding of the issues involved herein will be referred to by the court in this discussion.

The appeal in the White v. E. L. Bruce Company case, supra, to the Court of Appeals was limited to the correctness of the District Court's decision as to Patent No. 2,341,161, involved herein, and since no disclaimers of the invalid claims of Patents No. 2,276,253 and No. 2,288,585 were filed, those patents are invalid. Ensten et al. v. Simon, Ascher & Company, Incorporated, 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453.

The opinion of the Court of Appeals, 3 Cir., 162 F.2d 304, was filed May 29, 1947. No petition for writ of certiorari was prosecuted to the Supreme Court of the United States, but on September 22, 1947, the plaintiff, as assignee of all the right, title and interest in and to the patent herein involved, filed a statutory disclaimer in the United States Patent Office. The disclaimer, inter alia, stated:

"Your Petitioner, therefore, hereby disclaims from the specifications lines 46, 47 and 48, column 1, page 3, reading as follows: 'Other means for heating the flooring than by infra-red lamps could be used but the infra-red lamps have been found satisfactory in use'.

"Your Petitioner further hereby disclaims Claims 1, 3, 5, 6, 7, 8 and 9. Your Petitioner does not disclaim the phraseology or method of Claim 1 as the same is incorporated in, limited by, and made part of

dependent Claim 2; and, does not disclaim the phraseology or method of Claim 3 as the same is incorporated in, limited by, and made part of dependent Claim 4."

The defendant contends that as a result of the disclaimer that the burden is on the plaintiff to establish the validity of the patent as modified by the disclaimer. On the other hand the plaintiff contends that the patent as modified by the disclaimer is presumed to be valid, but regardless of any presumption of validity or non-presumption of validity under such facts, the entire proof was heard by the court and the factual question of the validity of the patent was thoroughly developed by the proof. The defendant does not contend that the patent is invalid by virtue of the decisions in the White v. E. L. Bruce Company case, supra, but does contend that the doctrine of comity should apply and that those decisions, finding certain claims of the patent in suit invalid, are highly persuasive.

At the beginning of the trial counsel for defendant stated:

"We have no contention of non-infringement in Claims 2 and 4, if valid, except on these two points; first, the one I have already mentioned as to the drying oil base, a resin, and a solvent, that is, we use different finish composition; and second, as to Claim 4 only, specifies that the second heating step, I believe both heating steps shall be of the order of two minutes; our contention is that ours is of the order of one minute and not of two minutes; those are the only two points that we will raise on the question of infringement or non-infringement."

The patent covers a process for factory finishing flooring complete, including waxing and polishing. The process consists of a true combination of steps and acts which cooperating with and modifying each other produce as a unitary result completely finished flooring in the short space of twelve minutes, and in a better, more facile and more economical way than ever achieved prior to the reduction of the process to practice.

Claim 2 states:

"The method of finishing wood flooring in an uninterrupted series of successive operations while the flooring moves continuously along a production line, the steps comprising:

"(1) applying uniformly to the wood a composition containing the necessary finishing elements, said composition being a penetrating seal type of finish which contains a drying oil base, a resin and a violatile solvent;

"(2) heating the wood and the applied composition by radiation which is predominantly infra-red in wave length, which penetrates both the composition and the underlying wood in order to remove moisture, volatilize the solvent and set the composition in the wood;

"(3) brushing and rubbing the finish-coated surface, while heated to effect removal of surplus composition from the surface and substantially uniform distribution of the composition in the surface pores of the wood, to thereby produce a smooth, sealed, finished surface;

"(4) applying wax to the said surface of the wood while the latter is still heated; and

"(5) brushing the waxed surface to polish it.

"The operations and steps being carried out in the order named."

Claim 4 adds a heating step and an additional rubbing and brushing after heating step to those set out in Claim 2.

The presence and execution of all of the steps cited in the Claims 2 and 4 produce:

(1) Completely prefinished flooring, properly filled, finished and waxed, within twelve minutes.

(2) The finish and silex filler is mixed and applied in one operation.

(3) The resulting finish on the flooring at the end of the process is superior to the finishes that resulted at the end of any of the processes of the prior art.

The testimony disclosed and the court found that the finish composition to be successful must be of the particular type recited in the claim and contain the ingredients recited in the claim, or the equivalent of the finish composition in order to properly cooperate with the other steps of the process. The process is applied in one un-

interrupted continuous motion while the flooring is moving down the production line. It is necessary that the heating of the flooring be by radiations predominantly infra-red in wave length in order to have proper penetration and produce the result of curing the finish on and in the pores of the wood in the short space of twelve minutes.

■■■■ The patent in suit was issued on an application that was filed the same day that the application for Patent No. 2,288,-585 was filed. Patent '161 specifically refers to Patent '585, but the process and the apparatus by which the process was performed are distinct, and of course, may be made the subject of different patents. Sbicca-Del Mac, Inc., et al. v. Milius Shoe Co., 8 Cir., 145 F.2d 389. The patentability of a process does not depend upon the characteristic principles of the apparatus although the apparatus or something similar thereto is necessary to the application of the process. Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L. Ed. 1034.

In Risdon Iron and Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 746; 39 L.Ed. 899, the Supreme Court of the United States said:

"It may be said in general that processes of manufacture which involve chemical or other similar elemental action are patentable, though mechanism may be necessary in the application or carrying out of such process, while those which consist solely in the operation of a machine are not. Most processes which have been held to be patentable require the aid of mechanism in their practical application, but, where such mechanism is subsidiary to the chemical action, the fact that the patentee may be entitled to a patent upon his mechanism does not impair his right to a patent for the process, since he would lose the benefit of his real discovery, which might be applied in a dozen different ways, if he were not entitled to such patent. But, if the operation of his device be purely mechanical, no such considerations apply, since the function of the machine is entirely independent of any chemical or other similar action."

See, also, Vapor Car Heating Company v. Gold Car Heating and Lighting Co., 2 Cir., 7 F.2d 284.

■■■ The claims of the patent in suit define a combination comprising the steps recited in the claims. It is this combination that is the invention. It is not the discovery of any one or more of the steps, but the combination of the steps that are so interrelated that they cooperate the one with the other as a whole to produce the unitary result, completely finished flooring.

■■■ The finish composition is "set" by the action of the infra-red heat energy. It is conceded by all of the experts that testified that finish composition can set only by evaporation of the solvent and oxidation and polymerization. The finish composition undergoes a chemical change. It goes on the flooring as a liquid and is transformed into a different state and thing, and can never be returned to its original liquid form. The plaintiff admits that a process patent to be valid must claim and must be something more than the mere function or operation of a machine. It can hardly be questioned that prefinished flooring could not be produced with the machine or apparatus of Patents '161 or '585. In order to obtain the finished production the flooring must be treated with a substance containing a drying oil base, resin and solvent, and that substance must be acted upon by force, whether applied by the particular apparatus in use or some other apparatus or by hand, thereby producing a chemical change, oxidation and polymerization. The defendant could not produce prefinished flooring on the production line and the machine that it has without the use of the method or process of the patent in suit. Thus the patent in suit is not a mere function or operation of the machine.

This brings the court to a consideration of the prior art pleaded in the answer of the defendant consisting of 16 patents issued to various persons between the dates of September 23, 1919, and June 15, 1943, and 16 printed publications, all of which were introduced in evidence.

In the case of Sinclair & Carroll Company, Inc., v. Interchemical Corporation,

325 U.S. 327, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, Mr. Justice Jackson said:

"There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951; Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F.2d 290; Franklin v. Masonite Corporation, 2 Cir., 132 F. 2d 800. It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F.2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent.

"A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display 'invention', 'more ingenuity * * * than the work of a mechanic skilled in the art.' Hicks v. Kelsey, 18 Wall. 670, 21 L.Ed. 852; Slawson v. Grand Street, P. & P. F. R. Co., 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576; Phillips v. City of Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; * * * Honolulu Oil Corporation v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980; Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 90, 62 S.Ct. 37, 40, 86 L.Ed. 58. This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee. Whether or not those efforts are of a special kind does not concern us. The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its inducement is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure. See Hartford-Empire Co. v. United States, 323 U.S. 386, [432, 433], 65 S.Ct. 373, at page 395 [89 L.Ed. 322]. Consequently it is not concerned with the quality of the inventor's mind, but with the quality of his product."

The defendant contends that the publications teach the use of infra-red lamps for drying coating and the like, and it did not require any ingenuity for Partee and Gray to conceive that the use of such lamps might speed up the drying of varnish on wood flooring, and that all that was needed was to give it a trial.

The patent in suit was a product of continued and long experimentation and the methods finally adopted were obtained contrary to the teachings of the prior art. Mr. McCloud of the Ford Motor Company, the owner of the Groven Patents, warns against the use of infra-red on wood and advises the use of the old convection oven such as that used by Derr. He said:

"The wood with a varnish coating on the surface which is dried by infra-red is much more inclined to blister than when the same varnish is baked in an air oven."

Mr. Kavanaugh in his article printed in the April, 1939, issue of The Edison Bulletin, and introduced as a part of the prior art, said:

"Enamels or paints having an oil base harden by oxidation of the oil. The rate of drying is slow; and although an increase of temperature will tend to hasten the oxidation reaction, the use of infra-red radiation is not practical because speed, the chief advantage of infra-red, is not obtainable."

All of the prior art taught that in baking a coating composition on wood in order to avoid blistering of the finish the ultimate temperature should be low and the coated surface brought up to that temperature very gradually. It was taught by the prior art at the time the application for Patent '161 was made that infra-red energy or heat should not be used on wood because in applying it the moisture was driven out of the wood and the finish would thus bubble and blister. The patentees disregarded the teachings of the prior art and used infra-red placed close to the wood knowing that such heat would produce bubbling and pin holeing, but they then advanced the art by providing the answer to the bubbling and pin holeing in providing the step of the patent requiring that the finish surface be rubbed and brushed while heated to remove the surplus of the finish from the wood pores and to provide a smooth surface for waxing. That particular step is

found nowhere in the prior art and will not work with any other finish than one of the penetrating seal type. By combining the various steps in the patent the patentees obtained remarkable speed and produced a product that met with almost instant and universal public acceptance.

An examination of the prior art discloses that it nowhere teaches the combination of a finish and filler for application at one and the same time. That is one of the steps of the patent in suit but at the time the patent was applied for such a step was unheard of and unrecognized.

Combining of the several steps when viewed in retrospect may now appear to be a simple thing and the natural thing to have done, but it had not been done prior to the application for the patent in suit.

In the case of Wire Wheel Corporation of America v. Madison Motor Car Company, D.C.W.D.Wis., 267 F. 220, 222, Judge Evans said:

"It is not difficult, after a problem has been solved, to take patent after patent, pick one feature from one patent, and another from the next, and then say the completed product is so near the patented product that the final step constituted but the work of a mechanic. But invention cannot be so determined. Rather must the mark of distinction fall on him who, appreciating both the means and desired ends, conceives of a relation of elements, old or new, in whole or in part, that will produce the desired results. It is quite immaterial if, after the conception is announced, the skilled mechanic readily understands it, or with slight or no difficulty builds the new device by practices or means well known to his trade."

In Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, at page 435, 31 S.Ct. 444, at page 447, 55 L.Ed. 527, the court in the course of the opinion said:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration. And it recognizes degrees of change, dividing inventions into primary and secondary, and as they are, one or the other, gives a proportionate dominion to its patent grant."

In Sbicca-Del Mac, Inc., et al. v. Milius Shoe Co., supra [145 F.2d 395], the Court of Appeals for the Eighth Circuit quoted with approval the following language from the case of Expanded Metal Co. v. Bradford, supra:

"It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. * * * It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent."

Simplicity of a process is not an objection and does not militate against the patentability of the process. G. H. Packwood Manufacturing Company v. St. Louis Janitor Supply Company, 8 Cir., 151 F.2d. 958–960.

The defendant in its advertisements while it was using the process of the patent in suit as a licensee heralded to the consuming public that the prefinished flooring was an amazing improvement over all other flooring then on the market.

In the patent in suit a piece of flooring is completely finished, including waxing, in twelve minutes. Derr required 124 minutes, using fast drying special materials. Partee '253 required a minimum of 840 minutes. Dittmar, who did not even wax the flooring, required a minimum of 2,160 minutes. This amazing reduction in the time required to completely finish floor-

ing by the patented method, as compared to that of the prior art, is much more than a percentage reduction. Derr required ten times the time of the patent, using fast drying lacquers. Partee '253 required seventy times the time of the patent; while Dittmar consumed one hundred and eighty times the time of the patent and did not wax the flooring.

Following the issuance of the patent in suit, at least five manufacturers of hard wood flooring, including the defendant, became licensees, and they, together with the plaintiff, by the use of the process of the patent have and are producing and selling the great majority of prefinished flooring. In fact practically 100 per cent of the factory finished flooring sold between the date of the issuance of the patent and November 18, 1946, was prefinished by the use of the process disclosed by the patent.

There is no dispute of the immediate, wide and extensive use of the patent. In view of the facts disclosed by the record, the following words of the Court of Appeals, 7th Circuit, in Coltman v. Colgates-Palmolive-Peet Co., 104 F.2d 508, 511, are particularly applicable:

"It must be conceded, however, that evidence of immediate, wide, and extensive use following the appearance of a patent may furnish invaluable evidence in cases which would otherwise be doubtful, and may well be described as more convincing and persuasive with courts than any other evidence save recognition by the trade and the payment of substantial royalties for a license to use the new patented discovery. Recognition by the trade is the best and most persuasive evidence that can be offered. The tribute of those engaged in the industries affected, especially when the tribute is evidenced by the payment of substantial royalties, is by far the most persuasive and unimpeachable evidence that can be offered to support the asserted validity of patent claims in litigation. Self interest of the licensee can be relied upon to prevent the payment of royalties, except for discoveries of recognized merit, and the larger and more numerous the royalty payments, the stronger the inference that payment is made only after the licensee has satisfied itself that the invention is meritorious and the claims covering the process or product are valid."

The defendant relies upon the 16 patents and 16 publications pleaded by it as a basis for its contention that the process is lacking in novelty and that the patent is not an invention. In effect, all that the prior art teaches, as disclosed by the detailed findings of fact, which cannot be set forth in full in this opinion because of their length, is that there had been prior attempts to solve the problem that confronted Partee and Gray, but the attempts were failures.

A brief resume of the items of the prior art relied upon most strongly by defendant will suffice.

The prior patent to Partee, No. 2,276,253, must have separate lines for applying finish and filler, and the flooring is not treated in one uninterrupted series of steps. The necessary finishing ingredients are not applied at once and the applied composition is not set by any form of heating. The flooring is not brushed while in a heated state, nor waxed while warm.

The Dittmar Patents 1,510,465, 1,510,466 and 1,510,467 each show a separate machine. One for applying the filler and one for the first coat of varnish and one for a second coat of varnish. The three machines must be used as a unit and are not operated as a continuous production line, but require a minimum of twelve hours between the machines and after the third machine to permit the applied coat to dry. No licenses were ever issued under these patents and the particular machines and methods used by the machines were abandoned about 1936. Not a single step of the process of the patent in suit is described by the Dittmar Patents.

Patent 1,860,664 to Edgecumbe and Bishop lacks every step of the patent in suit. It does not select a penetrating seal type of finish, does not heat the surface of the wood with infra-red energy and does not brush the flooring while in a heated condition. There is no wax and no polish.

The article by Derr fails to disclose much important information that would be necessary to the practice of the processes about which he writes. The processes were tried and failed, and a perfunctory

examination discloses that it is not a practical method for prefinishing flooring. He does not apply all of the necessary finish ingredients at one time. He does not heat the flooring with infra-red energy, nor brush the finish coating while the flooring is heated, and does not wax the flooring while warm.

Patent No. 2,236,397 to Drummond does not contemplate a penetrating seal type of finish. Such finish as is used is not heated by heat that penetrates the wood and there is no brushing and waxing after heating, nor polishing after waxing. Likewise Patent No. 2,283,420 to Drummond lacks every step of the patent in suit.

Patent No. 2,321,937 to Quinn, lacks the penetrating finish and while infra-red energy is used it is not used by the same process as by the patent in suit. There is no brushing and rubbing after heating, and there is no waxing or polishing after waxing. Clearly the process of that patent is not suitable for prefinishing flooring.

Patent 1,702,043 to Elliott, relates to a process for treating leather and does not have a single step of the process of the patent in suit.

The alleged Murray Bodies public use and the Boynton public use lack the step of applying a penetrating finish, the step of quickly drying and setting an oil base composition on and in wood with infra-red heat. Likewise there was no brushing and rubbing while the wood is heated, or waxing and polishing. There is no teaching disclosed by the public uses that teaches the main advantage of the use of infra-red heat, speed.

■ In view of the facts the words of the court in Reynolds et al. v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 84 are applicable:

"Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

■ The following statement of Judge Sanborn speaking for the Court of Appeals, Eighth Circuit, in the case of G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., supra [115 F.2d 964], is decisive of the contention of defendant that the patent in suit lacks invention:

"It is safe to say that, prior to Packwood, no patent, domestic or foreign, shown by the record, disclosed his combination or anything closely approaching it. There is no evidence that any of the combinations of the prior art successfully dispensed soap, which, after all, is the main purpose of a soap dispenser. The evidence indicates that Packwood's dispenser successfully dispenses, and continues to dispense, soap. While his contribution to the art was not that of a pioneer, the fact that all of the elements of his combination were old and that each had been used separately before in some device does not show lack of invention nor limit him so strictly to his peculiar structure as to destroy the worth of his patent. Rudimentary experiments with isolated elements of a combination do not anticipate or discredit invention. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 255, 8 S.Ct. 122, 31 L.Ed. 141; Smith v. Snow 294 U.S. 1, 17, 55 S.Ct. 279, 79 L.Ed. 721. 'It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest to a mechanic skilled in the art, and is entitled to protection as an inventor.' Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034."

The defendant also contends that Claim 2 of the patent is not definitely distinguishable from disclaimed Claim 1. Formal Finding of Fact No. 21 by the court is as follows:

"Claim 2 is definitely distinguishable from Claim 1."

Claim 2 of the patent is limited to heat by radiations that is predominantly infra-red energy, whereas disclaimed Claim 1 is not. The question was fully covered by the testimony, and the court is convinced that the claims are clearly distinguishable. The words "heat which penetrates" as used in the disclaimed Claim 1 were susceptible of more than one meaning. It is a broad term that would include infra-red, but the term "radiations predominantly infra-red

in wave length" is a specific term. Any type of heat will penetrate but only heat by radiation will penetrate the object as a ray and turn into heat within and be absorbed by the object. Radiation heats not from the outside in but from the inside out.

The plaintiff experimented with convection heat and abandoned it because it did not work effectively, and therefore, could not claim a process which utilized that step which it knew would not function properly, and therefore, when put on notice by the District Court and Court of Appeals in the White v. E. L. Bruce Co. case that it had included in Claim 1 as a step of its process a type of heat, "convection", which it knew would not work and the plaintiff had not in fact intended to claim as a part of its invention, the plaintiff filed a disclaimer. The disclaimer did not disclaim the process of Claim 1 but retained that process and specifically limited the heat step of the process to radiations predominantly infra-red in wave length. Thus the plaintiff by disclaimer narrowed its claim by eliminating any heat step other than that produced by radiation. The disclaimer was filed within 30 days after time to apply for writ of certiorari from the Court of Appeals decision of the Third Circuit. The disclaimer as filed was within a reasonable time. Bassick Mfg. Co. v. Adams Grease Gun Corporation, D.C.S.D.N.Y., 39 F.2d 904.

In Freeman et al. v. Altvater et al. 8 Cir., 138 F.2d 854-857, the court said:

"If the purpose is to reform or alter the description of the invention or to convert a claim from one thing into something else, it must be accomplished by reissue; but if the purpose is to obviate an ambiguity in a specification it must be by disclaimer."

See, also: Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc. 6 Cir., 111 F.2d 239; Payne Furnace & Supply Co., Inc., v. Williams-Wallace Co., 9 Cir., 117 F.2d 823.

In view of the decision in the Virginia Oak Flooring Co. case, supra, the action of the plaintiff in filing the disclaimer was proper and the narrow claim, Claim 2, retained, is definitely distinguishable from the broad claims of Claim 1, which was disclaimed.

Therefore, the patent in suit as modified by the disclaimer is valid and this brings the court to the question of whether the defendant infringes Claims 2 and 4.

The defendant earnestly contends that it does not infringe Claims 2 and 4, because it does not use the sort of composition specified in those claims as an essential part of the method claimed. It first argues in support of the contention that an examination of the file wrapper and contents, introduced in evidence as defendant's Exhibit 1, discloses that the claims were limited to a particular type of composition "which contains a drying oil base, a resin, and a volatile solvent" and that the composition used by the defendant does not contain a drying oil base, a resin, and a solvent, and that the plaintiff is not entitled to claim the benefit of the doctrine of equivalents to avoid the effect of a limitation inserted in the claims of the patent after the original claims had been rejected. The doctrine of file wrapper estoppel is clearly announced in the case of I. T. S. Rubber Company v. Essex Rubber Company, 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335, cited and relied upon by defendant. That doctrine or rule is that after amending a rejected claim a patentee is estopped to claim the benefit of his rejected claim and to claim such a construction of his amended claim as would be equivalent thereto. In other words he cannot resort to the doctrine of equivalents giving to the amended claim the larger scope which it might have had without the amendments.

The plaintiff contends that the doctrine of file wrapper estoppel is not applicable in view of the facts. The court in formal finding of fact no. 30, after examining the file wrapper and its contents, made the following finding of fact:

"Plaintiff in its proof of infringement does not broaden its claim to eliminate any limitation required therein in order to obtain the patent grant or allowance of the claims by the Patent Office."

The claim that was rejected was designated as Claim 16 and called for "a composition having a skin forming drying oil base and a volatile vehicle." Likewise rejected Claims 21 and 22 called for "a com-

position having a drying oil base and a volatile vehicle." When those claims were rejected the applicants for the patent filed a supplemental amendment on September 7, 1943. The changes in those claims to present Claims 2 and 4 in so far as the finish composition is concerned were the addition of the words "penetrating seal type", the addition of "a resin" and a change from the words "volatile vehicle" to "volatile solvent".

The defendant in its trial brief stated:

"The composition applied by the defendant to its wood flooring contains naphtha as a solvent, and a modified alkyd resin having soya bean acid linked to the resin molecule. It includes no drying oil base."

Defendant admits that its finish or composition is of the "penetrating seal type" and that it contains a resin and a volatile solvent.

The words "drying oil base" were not added by amendment. The plaintiff is not seeking to apply the doctrine of equivalents to a finish not of the "penetrating seal type" or to a finish which does not contain a resin or a volatile solvent. In its claim of infringement the plaintiff is not seeking to broaden its claims by dropping any element which it was compelled to include by amendment to the original claim in order to secure the patent, and therefore, the doctrine of file wrapper estoppel does not apply under the facts disclosed by the record. Kesling v. General Motors Corporation, D.C.E.D. Mo., 66 F. Supp. 1, affirmed 8 Cir., 164 F.2d 824.

When the contention of the defendant is analyzed in so far as the charge of infringement of Claim 2 is concerned it is reduced to the contention that it does not infringe because its composition does not contain a drying oil base, and in support of that contention the defendant argues that soya oil is not used in the manufacture of the finish in that the fatty acids of the oil are used and that the fatty acids are not "contained" in the finish because the finish is a chemical compound and not mixture, and that the fatty acids having become linked to the resin molecule do not exist in the finish as such.

Much testimony was introduced by the parties in support of their respective contentions as to the composition of the finish used by each of them, and the court after hearing that testimony concluded that the composition used by the defendant does in fact contain a drying oil base.

On August 20, 1946, the defendant served notice on the plaintiff of the cancellation of the license under which defendant had been operating and on that same date the finish formula was revised, or in other words, the defendant began using the finish composition that it was using on the date of the trial. That composition is purchased by the defendant from duPont and is known as DuLux Finish RC–8005 and DuLux Filler 27–8001. It is the use of that composition which the defendant claims relieves it from the charge of infringement, because it does not contain a drying oil base, but it is admitted that the resin in the composition is modified with 50-80 per cent drying oils. The new composition is applied exactly as was the composition used when the defendant was operating under license, and it functions in the same manner, produces the same result in the same way, and the claims made by the defendant to the public are exactly the same as the claims made by it in its prefinishing of flooring prior to August 20, 1946. For instance, there appears in the record three specimens of advertising. One in the American Builder of October, 1947, another in the same magazine issued in December, 1947, and one in the American Lumberman dated October 12, 1946, in all of which the product is advertised as superior hard wood flooring finished by assembly line methods that is an amazing improvement. The cardinal points of superiority are listed:

(1) Straight line ripping,

(2) Machine sanding-steel wool polishing,

(3) No raised grain,

(4) Best quality filler, rubbed in,

(5) Deep penetrating finish seals wood pores,

(6) Finish dries evenly in "controlled weather",

(7) Final polishing by high-speed brushes,

(8) Heavy-bodied wax, machine buffed,

(9) Uniform color in rich, lustrous, lasting beauty.

An examination of the advertising dated prior to August 20, 1946, reveals exactly the same claims and the same points of superiority.

The filler composition which the defendant began using following its notice to the plaintiff of the cancellation of the license is manufactured and marketed under United States Patent No. 2,225,262, introduced in evidence as plaintiff's Exhibit 19, and the finish composition, RC–8005, is the same thing as the vehicle used in the filler. The patent contains a description of the finish composition, RC–8005, which reads as follows:

"The vehicle is a poly-hydric alcohol poly-basic acid resin containing in combined form substantial amount of drying oil, this amount preferably being from 50-80 per cent."

Certainly RC–8005 contains a drying oil and a resin, and the drying oil contained therein constitutes the base, because without the oil you would not have a floor finish.

■ It does not seem practical to enter into a scientific discussion of the composition used by plaintiff and that now in use by the defendant, but from a practical standpoint they are essentially the same, and both are deep penetrating finishes which seal the wood pores. A comparison of the testimony of the experts tends to bewilderment and makes appropriate the following words of the court in Bianchi et al. v. Barili, 9 Cir., 1948, 168 F.2d 793, 801:

"A leading text-writer on the law of patents has pointed out that infringement is a question of fact. 3 Walker § 450, page 1680.

"It is also a question of substance, and not of nomenclature. It is not to be settled by striving to ascertain the difference between tweedledum and tweedledee."

Therefore when the question is approached as a practical business man would approach it there does not seem to be any question but that the defendant does infringe Claim 2 of the patent in suit.

What has been said with respect to the finish composition applies of course to Claim 4 but the defendant additionally contends that Claim 4 is not infringed for the reason that it employs no heating steps of the order of two minutes.

The specifications of the patent in suit state the length of each heating tunnel and that the flooring is moved along the line through the tunnel by a conveyor belt driven at the rate of 17 feet per minute. The defendant has practically duplicated the length of the tunnel but has advanced the speed of the belt from 17 feet to 24.2 feet per minute, thus reducing the time which a piece of flooring remains in the tunnel to about 1¼ minutes, and because of that mechanical adjustment, which consists merely of advancing the speed of the belt, contends that it does not infringe Claim 4.

In Smith v. Snow et al., 294 U.S. 1-20, 55 S.Ct. 279, 287, 79 L.Ed. 721, the court said:

"Respondents do not avoid infringement of the method by varying the details of the apparatus by which they make use of it. Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139; Tilghman v. Proctor, 102 U.S. 707, 730, 731, 26 L.Ed. 279."

In Sbicca-Del Mac, Inc., et al. v. Milius Shoe Co., supra, the court said:

"It has long been settled that infringement of a method can not be avoided by merely varying the details of the apparatus made use of. (Citing cases)"

■ Under the facts as found by the court the defendant infringes both Claims 2 and 4 of the patent in suit.

### Second Cause of Action

As heretofore stated, the plaintiff, by amendment on March 18, 1948, filed its Second Cause of Action for a preliminary and final injunction against further use by defendant of improvements, devices, and information described in the complaint and for an accounting of profits, damages and royalties due plaintiff by reason of the use of such improvements, devices and information.

The complaint identifies the devices and improvements as being in use on December

18, 1947, on defendant's prefinishing line 2, located at certain designated points thereon.

In due time the defendant filed answer denying that the matter in controversy exceeded in value, exclusive of interest and costs, the sum of $3,000, and denying that any improvements, devices or information were released by plaintiff to the defendant or wrongfully used by the defendant.

The court found that the defendant did obtain trade secrets from the plaintiff as alleged in the complaint and as specifically found in finding of fact No. 52, which finding described in detail the trade secrets. That finding of fact has been impounded under the authority of an order of the court entered in the case on April 3, 1948. The testimony, disclosing fully the trade secrets, was heard in camera, and for that reason the trade secrets are not more specifically described herein, but the parties have access to the findings of fact.

Likewise the court found that the secrets were given to the defendant for the mutual benefit of both parties at a time when the defendant was a licensee under certain Letters Patent, including the patent involved in the first cause of action and owned by the plaintiff, and that the defendant had manufactured approximately 20 million feet of flooring since November 18, 1946, the date the cancellation of the license became effective, using the trade secrets and it had not paid plaintiff any consideration therefor. Other facts are stated in the findings filed with the clerk but the above should suffice for an understanding of the contentions of the parties as to the alleged second cause of action.

The defendant's first contention is that the court is without jurisdiction because of the failure of the plaintiff to prove that there is involved in the controversy an amount in excess of $3,000, exclusive of interest and costs, but it is not denied that the defendant continued to use the trade secrets after the cancellation of the license agreement, and that it produced prefinished hard wood flooring of the approximate value of $3,000,000 for which, under the license, it paid a royalty of $1 per thousand board feet, and upon the amount admittedly produced since November 18, 1946, there would be due, if damages are assessed at the rate of $1 per thousand board feet, at least $20,000. The court has found that the jurisdictional amount exists, and the proof amply justifies such holding.

Prior to the time of the development of the trade secrets by the plaintiff the defendant was having difficulty in waxing the flooring. The duPont Company had been unable to solve the difficulty, and in May, 1944, the president of the defendant made a trip to Wilmington, Delaware, to discuss the situation with duPont. The only consolation he received was that duPont would keep working on the wax and apparently that company did, but Mr. Fullerton said their difficulties had not been solved on July 14, 1944. At that time the officers of the defendant, upon invitation of plaintiff, visited the plant of the plaintiff at Memphis, Tennessee, and were there shown the alleged trade secrets and the method of the hard wax and the manner of applying it. At the request of the defendant the plaintiff sent to the defendant's plant at Warren, Arkansas, some of its employees, who installed the mechanical devices with which to apply the hard wax method which had been developed by plaintiff. These disclosures were made because of the close relationship existing between the parties as well as the provisions of the license agreement under which the defendant was prefinishing hard wood flooring. They were made by the plaintiff to enable the defendant to produce a superior product and to stay in business and to pay royalties under the license agreement. It is true that the devices and the hard wax method had not been patented, but there isn't any doubt that the process and the devices for applying the wax were valuable improvements and were so regarded by all of the parties. After they were imparted to the defendant as a crowning achievement and one that would preserve hard wood floors and make less difficult their upkeep and care. The license agreement provided that it should extend to all apparatus and method inventions, patents for which were then or which might during the term of the license be owned by the licensor. The license had several years to

run unless terminated by specific notice, and certainly a termination was not contemplated by the parties at the time the plaintiff opened its plant and opened the trade secrets to inspection by the defendant and its employees. The defendant at once appreciated the value of the devices and improvements, or it would not have requested the plaintiff to send its employees to Warren, Arkansas, to install them on its prefinishing line.

It is immaterial whether the trade secrets were patentable and the fact remains that they were not disclosed to the defendant prior to July 14, 1944, and the disclosure was made under completely confidential relations, as well as in discharge of a contractual obligation of plaintiff to give the defendant free use of all improvements so long as the license agreement was in force and defendant paid plaintiff the agreed royalties.

■■■■ In Sandlin et al. v. Johnson, 8 Cir., 141 F.2d 660, 661, the court stated the general rule as follows:

" * * * though a trade secret be unpatentable, it will nevertheless be protected from use or disclosure by one to whom it has been revealed in confidence. Restatement, Torts #757; Germo Mfg. Co. v. Combs, 209 Mo.App. 651, 678, 240 S. W. 872, 881; Godefroy Mfg. Co. v. Lady Lennox Co., Mo.App., 134 S.W.2d 140, 141; Luckett v. Orange Julep Co., 271 Mo. 289, 196 S.W. 740; A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, 538, 539; Id. 6 Cir., 74 F.2d 934; American Dirigold Corporation v. Dirigold Metals Corporation, 6 Cir., 125 F.2d 446, 452; Peabody v. Norfolk, 98 Mass. 452, 458, 96 Am.Dec. 664; Stewart v. Hook, 118 Ga. 445, 45 S.E. 369, 370, 63 L.R.A. 255; Salomon v. Hertz, 40 N.J. Eq. 400, 2 A. 379, 380, 381.

" 'A trade secret may consist of any formula [process,] pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' Restatement, Torts, #757, comment b."

The defendant has not cited nor has the court found any decision of the Supreme Court or any other court in Arkansas that indicates that the general rule as above set forth is not the law of Arkansas.

The operations within the plaintiff's plant at Memphis were carefully guarded and were not revealed to any one except those entitled thereto under the terms of the license agreements. They were revealed to the defendant because of the license agreement and it is difficult to perceive of a more confidential relationship than the one existing between the parties under which the defendant accepted, adopted and put in use the trade secrets.

■■■■ The facts here require the application of the principle that equity will not permit one to unjustly enrich himself at the expense of another. Ordinarily in such a situation the plaintiff would be entitled to profits and damages arising from the use of the trade secrets, but in view of the fact that the information consisting of the method and devices for applying the hard wax were revealed to aid defendant in obtaining more desirable results in the execution of the process of the patent which the court has held is infringed by defendant, the amount of recovery should be limited to the amount that the parties fixed by agreement and which the defendant would have paid but for its action in cancelling the license agreement. Saco-Lowell Shops et al. v. Reynolds et al., 4 Cir., 141 F.2d 587, 598. This amount is $1 per thousand board feet prefinished by defendant since November 18, 1946.

■■■■ The plaintiff is entitled to an injunction enjoining the defendant from further infringement of Claims 2 and 4 of the patent in suit and likewise from further use of the trade secrets described in the second cause of action and for an accounting disclosing the amount of all hard wood strip flooring prefinished by the defendant since November 18, 1946.